(Slip Opinion) OCTOBER TERM, 2012 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## UNIVERSITY OF TEXAS SOUTHWESTERN MEDICAL CENTER *v.* NASSAR

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

No. 12–484.   Argued April 24, 2013—Decided June 24, 2013

Petitioner, a university medical center (University) that is part of the University of Texas system, specializes in medical education. It has an affiliation agreement with Parkland Memorial Hospital (Hospital), which requires the Hospital to offer vacant staff physician posts to University faculty members. Respondent, a physician of Middle Eastern descent who was both a University faculty member and a Hospital staff physician, claimed that Dr. Levine, one of his supervisors at the University, was biased against him on account of his religion and ethnic heritage. He complained to Dr. Fitz, Levine's supervisor. But after he arranged to continue working at the Hospital without also being on the University's faculty, he resigned his teaching post and sent a letter to Fitz and others, stating that he was leaving because of Levine's harassment. Fitz, upset at Levine's public humiliation and wanting public exoneration for her, objected to the Hospital's job offer, which was then withdrawn. Respondent filed suit, alleging two discrete Title VII violations. First, he alleged that Levine's racially and religiously motivated harassment had resulted in his constructive discharge from the University, in violation of 42 U. S. C. §2000e–2(a), which prohibits an employer from discriminating against an employee "because of such individual's race, color, religion, sex, and national origin" (referred to here as status-based discrimination). Second, he claimed that Fitz's efforts to prevent the Hospital from hiring him were in retaliation for complaining about Levine's harassment, in violation of §2000e–3(a), which prohibits employer retaliation "because [an employee] has opposed . . . an unlawful employment practice . . . or . . . made a [Title VII] charge." The jury found for respondent on both claims. The Fifth Circuit va-

cated as to the constructive-discharge claim, but affirmed as to the retaliation finding on the theory that retaliation claims brought under §2000e–3(a)—like §2000e–2(a) status-based claims—require only a showing that retaliation was a motivating factor for the adverse employment action, not its but-for cause, see §2000e–2(m). And it found that the evidence supported a finding that Fitz was motivated, at least in part, to retaliate against respondent for his complaints about Levine.

*Held*: Title VII retaliation claims must be proved according to traditional principles of but-for causation, not the lessened causation test stated in §2000e–2(m). Pp. 5–23.

(a) In defining the proper causation standard for Title VII retaliation claims, it is presumed that Congress incorporated tort law's causation in fact standard—*i.e.,* proof that the defendant's conduct did in fact cause the plaintiff's injury—absent an indication to the contrary in the statute itself. See *Meyer* v. *Holley*, 537 U. S. 280, 285. An employee alleging status-based discrimination under §2000e–2 need not show "but-for" causation. It suffices instead to show that the motive to discriminate was one of the employer's motives, even if the employer also had other, lawful motives for the decision. This principle is the result of *Price Waterhouse* v. *Hopkins*, 490 U. S. 228, and the ensuing Civil Rights Act of 1991 (1991 Act), which substituted a new burden-shifting framework for the one endorsed by *Price Waterhouse.* As relevant here, that Act added a new subsection to §2000e–2, providing that "an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice," §2000e–2(m).

Also relevant here is this Court's decision in *Gross* v. *FBL Financial Services, Inc.*, 557 U. S. 167, 176, which interprets the Age Discrimination in Employment Act of 1967 (ADEA) phrase "because of . . . age," 29 U. S. C. §623(a)(1). *Gross* holds two insights that inform the analysis of this case. The first is textual and concerns the proper interpretation of the term "because" as it relates to the principles of causation underlying both §623(a) and §2000e–3(a). The second is the significance of Congress' structural choices in both Title VII itself and the 1991 Act. Pp. 5–11.

(b) Title VII's antiretaliation provision appears in a different section from its status-based discrimination ban. And, like §623(a)(1), the ADEA provision in *Gross*, §2000e–3(a) makes it unlawful for an employer to take adverse employment action against an employee "because" of certain criteria. Given the lack of any meaningful textual difference between §2000e–3(a) and §623(a)(1), the proper conclusion is that Title VII retaliation claims require proof that the desire

to retaliate was the but-for cause of the challenged employment ac-
tion. Respondent and the United States maintain that §2000e–2(m)'s
motivating-factor test applies, but that reading is flawed. First, it is
inconsistent with the provision's plain language, which addresses on-
ly race, color, religion, sex, and national origin discrimination and
says nothing about retaliation. Second, their reading is inconsistent
with the statute's design and structure. Congress inserted the moti-
vating-factor provision as a subsection within §2000e–2, which deals
only with status-based discrimination. The conclusion that Congress
acted deliberately in omitting retaliation claims from §2000–2(m) is
reinforced by the fact that another part of the 1991 Act, §109, ex-
pressly refers to all unlawful employment actions. See *EEOC* v. *Ara-
bian American Oil Co.*, 499 U. S. 244, 256. Third, the cases they rely
on, which state the general proposition that Congress' enactment of a
broadly phrased antidiscrimination statute may signal a concomitant
intent to ban retaliation against individuals who oppose that discrim-
ination, see, *e.g., CBOCS West, Inc.* v. *Humphries*, 553 U. S. 442,
452–453; *Gómez-Pérez* v. *Potter*, 553 U. S. 474, do not support the
quite different rule that every reference to race, color, creed, sex, or
nationality in an antidiscrimination statute is to be treated as a syn-
onym for "retaliation," especially in a precise, complex, and exhaus-
tive statute like Title VII. The Americans with Disabilities Act of
1990, which contains seven paragraphs of detailed description of the
practices constituting prohibited discrimination, as well as an ex-
press antiretaliation provision, and which was passed only a year be-
fore §2000e–2(m)'s enactment, shows that when Congress elected to
address retaliation as part of a detailed statutory scheme, it did so
clearly. Pp. 11–17.

   (c) The proper interpretation and implementation of §2000e–3(a)
and its causation standard are of central importance to the fair and
responsible allocation of resources in the judicial and litigation sys-
tems, particularly since retaliation claims are being made with ever-
increasing frequency. Lessening the causation standard could also
contribute to the filing of frivolous claims, siphoning resources from
efforts by employers, agencies, and courts to combat workplace har-
assment. Pp. 18–20.

   (d) Respondent and the Government argue that their view would
be consistent with longstanding agency views contained in an Equal
Employment Opportunity Commission guidance manual, but the
manual's explanations for its views lack the persuasive force that is a
necessary precondition to deference under *Skidmore* v. *Swift & Co.*,
323 U. S. 134, 140. Respondent's final argument—that if §2000e–
2(m) does not control, then the *Price Waterhouse* standard should—is
foreclosed by the 1991 Act's amendments to Title VII, which dis-

placed the *Price Waterhouse* framework.  Pp. 20–23.

674 F. 3d 448, vacated and remanded.

KENNEDY, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SCALIA, THOMAS, and ALITO, JJ., joined.  GINSBURG, J., filed a dissenting opinion, in which BREYER, SOTOMAYOR, and KAGAN, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 12–484

UNIVERSITY OF TEXAS SOUTHWESTERN MEDICAL CENTER, PETITIONER *v.* NAIEL NASSAR

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

[June 24, 2013]

JUSTICE KENNEDY delivered the opinion of the Court.

When the law grants persons the right to compensation for injury from wrongful conduct, there must be some demonstrated connection, some link, between the injury sustained and the wrong alleged. The requisite relation between prohibited conduct and compensable injury is governed by the principles of causation, a subject most often arising in elaborating the law of torts. This case requires the Court to define those rules in the context of Title VII of the Civil Rights Act of 1964, 42 U. S. C. §2000e *et seq.*, which provides remedies to employees for injuries related to discriminatory conduct and associated wrongs by employers.

Title VII is central to the federal policy of prohibiting wrongful discrimination in the Nation's workplaces and in all sectors of economic endeavor. This opinion discusses the causation rules for two categories of wrongful employer conduct prohibited by Title VII. The first type is called, for purposes of this opinion, status-based discrimination. The term is used here to refer to basic workplace protection such as prohibitions against employer discrimination

on the basis of race, color, religion, sex, or national origin, in hiring, firing, salary structure, promotion and the like. See §2000e–2(a). The second type of conduct is employer retaliation on account of an employee's having opposed, complained of, or sought remedies for, unlawful workplace discrimination. See §2000e–3(a).

An employee who alleges status-based discrimination under Title VII need not show that the causal link between injury and wrong is so close that the injury would not have occurred but for the act. So-called but-for causation is not the test. It suffices instead to show that the motive to discriminate was one of the employer's motives, even if the employer also had other, lawful motives that were causative in the employer's decision. This principle is the result of an earlier case from this Court, *Price Waterhouse* v. *Hopkins*, 490 U. S. 228 (1989), and an ensuing statutory amendment by Congress that codified in part and abrogated in part the holding in *Price Waterhouse*, see §§2000e–2(m), 2000e–5(g)(2)(B). The question the Court must answer here is whether that lessened causation standard is applicable to claims of unlawful employer retaliation under §2000e–3(a).

Although the Court has not addressed the question of the causation showing required to establish liability for a Title VII retaliation claim, it has addressed the issue of causation in general in a case involving employer discrimination under a separate but related statute, the Age Discrimination in Employment Act of 1967 (ADEA), 29 U. S. C. §623. See *Gross* v. *FBL Financial Services, Inc.*, 557 U. S. 167 (2009). In *Gross*, the Court concluded that the ADEA requires proof that the prohibited criterion was the but-for cause of the prohibited conduct. The holding and analysis of that decision are instructive here.

I

Petitioner, the University of Texas Southwestern Medi-

cal Center (University), is an academic institution within the University of Texas system. The University specializes in medical education for aspiring physicians, health professionals, and scientists. Over the years, the University has affiliated itself with a number of healthcare facilities including, as relevant in this case, Parkland Memorial Hospital (Hospital). As provided in its affiliation agreement with the University, the Hospital permits the University's students to gain clinical experience working in its facilities. The agreement also requires the Hospital to offer empty staff physician posts to the University's faculty members, see App. 361–362, 366, and, accordingly, most of the staff physician positions at the Hospital are filled by those faculty members.

Respondent is a medical doctor of Middle Eastern descent who specializes in internal medicine and infectious diseases. In 1995, he was hired to work both as a member of the University's faculty and a staff physician at the Hospital. He left both positions in 1998 for additional medical education and then returned in 2001 as an assistant professor at the University and, once again, as a physician at the Hospital.

In 2004, Dr. Beth Levine was hired as the University's Chief of Infectious Disease Medicine. In that position Levine became respondent's ultimate (though not direct) superior. Respondent alleged that Levine was biased against him on account of his religion and ethnic heritage, a bias manifested by undeserved scrutiny of his billing practices and productivity, as well as comments that "'Middle Easterners are lazy.'" 674 F. 3d 448, 450 (CA5 2012). On different occasions during his employment, respondent met with Dr. Gregory Fitz, the University's Chair of Internal Medicine and Levine's supervisor, to complain about Levine's alleged harassment. Despite obtaining a promotion with Levine's assistance in 2006, respondent continued to believe that she was biased

against him. So he tried to arrange to continue working at the Hospital without also being on the University's faculty. After preliminary negotiations with the Hospital suggested this might be possible, respondent resigned his teaching post in July 2006 and sent a letter to Dr. Fitz (among others), in which he stated that the reason for his departure was harassment by Levine. That harassment, he asserted, "'stems from . . . religious, racial and cultural bias against Arabs and Muslims.'" *Id.,* at 451. After reading that letter, Dr. Fitz expressed consternation at respondent's accusations, saying that Levine had been "publicly humiliated by th[e] letter" and that it was "very important that she be publicly exonerated." App. 41.

Meanwhile, the Hospital had offered respondent a job as a staff physician, as it had indicated it would. On learning of that offer, Dr. Fitz protested to the Hospital, asserting that the offer was inconsistent with the affiliation agreement's requirement that all staff physicians also be members of the University faculty. The Hospital then withdrew its offer.

After exhausting his administrative remedies, respondent filed this Title VII suit in the United States District Court for the Northern District of Texas. He alleged two discrete violations of Title VII. The first was a status-based discrimination claim under §2000e–2(a). Respondent alleged that Dr. Levine's racially and religiously motivated harassment had resulted in his constructive discharge from the University. Respondent's second claim was that Dr. Fitz's efforts to prevent the Hospital from hiring him were in retaliation for complaining about Dr. Levine's harassment, in violation of §2000e–3(a). 674 F. 3d, at 452. The jury found for respondent on both claims. It awarded him over $400,000 in backpay and more than $3 million in compensatory damages. The District Court later reduced the compensatory damages award to $300,000.

On appeal, the Court of Appeals for the Fifth Circuit affirmed in part and vacated in part. The court first concluded that respondent had submitted insufficient evidence in support of his constructive-discharge claim, so it vacated that portion of the jury's verdict. The court affirmed as to the retaliation finding, however, on the theory that retaliation claims brought under §2000e–3(a)—like claims of status-based discrimination under §2000e–2(a)—require only a showing that retaliation was a motivating factor for the adverse employment action, rather than its but-for cause. See *id.,* at 454, n. 16 (citing *Smith* v. *Xerox Corp.*, 602 F. 3d 320, 330 (CA5 2010)). It further held that the evidence supported a finding that Dr. Fitz was motivated, at least in part, to retaliate against respondent for his complaints against Levine. The Court of Appeals then remanded for a redetermination of damages in light of its decision to vacate the constructive-discharge verdict.

Four judges dissented from the court's decision not to rehear the case en banc, arguing that the Circuit's application of the motivating-factor standard to retaliation cases was "an erroneous interpretation of [Title VII] and controlling caselaw" and should be overruled en banc. 688 F. 3d 211, 213–214 (CA5 2012) (Smith, J., dissenting from denial of rehearing en banc).

Certiorari was granted. 568 U. S. \_\_\_ (2013).

## II

### A

This case requires the Court to define the proper standard of causation for Title VII retaliation claims. Causation in fact—*i.e.,* proof that the defendant's conduct did in fact cause the plaintiff's injury—is a standard requirement of any tort claim, see Restatement of Torts §9 (1934) (definition of "legal cause"); §431, Comment *a* (same); §279, and Comment *c* (intentional infliction of physical harm); §280 (other intentional torts); §281(c) (negligence). This in-

cludes federal statutory claims of workplace discrimination. *Hazen Paper Co.* v. *Biggins*, 507 U. S. 604, 610 (1993) (In intentional-discrimination cases, "liability depends on whether the protected trait" "actually motivated the employer's decision" and "had a determinative influence on the outcome"); *Los Angeles Dept. of Water and Power* v. *Manhart*, 435 U. S. 702, 711 (1978) (explaining that the "simple test" for determining a discriminatory employment practice is "whether the evidence shows treatment of a person in a manner which but for that person's sex would be different" (internal quotation marks omitted)).

In the usual course, this standard requires the plaintiff to show "that the harm would not have occurred" in the absence of—that is, but for—the defendant's conduct. Restatement of Torts §431, Comment *a* (negligence); §432(1), and Comment *a* (same); see §279, and Comment *c* (intentional infliction of bodily harm); §280 (other intentional torts); Restatement (Third) of Torts: Liability for Physical and Emotional Harm §27, and Comment *b* (2010) (noting the existence of an exception for cases where an injured party can prove the existence of multiple, independently sufficient factual causes, but observing that "cases invoking the concept are rare"). See also Restatement (Second) of Torts §432(1) (1963 and 1964) (negligence claims); §870, Comment *l* (intentional injury to another); cf. §435a, and Comment *a* (legal cause for intentional harm). It is thus textbook tort law that an action "is not regarded as a cause of an event if the particular event would have occurred without it." W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts 265 (5th ed. 1984). This, then, is the background against which Congress legislated in enacting Title VII, and these are the default rules it is presumed to have incorporated, absent an indication to the contrary in the statute itself. See *Meyer* v. *Holley*, 537 U. S. 280, 285 (2003); *Carey* v.

*Piphus*, 435 U. S. 247, 257–258 (1978).

## B

Since the statute's passage in 1964, it has prohibited employers from discriminating against their employees on any of seven specified criteria. Five of them—race, color, religion, sex, and national origin—are personal characteristics and are set forth in §2000e–2. (As noted at the outset, discrimination based on these five characteristics is called status-based discrimination in this opinion.) And then there is a point of great import for this case: The two remaining categories of wrongful employer conduct—the employee's opposition to employment discrimination, and the employee's submission of or support for a complaint that alleges employment discrimination—are not wrongs based on personal traits but rather types of protected employee conduct. These latter two categories are covered by a separate, subsequent section of Title VII, §2000e–3(a).

Under the status-based discrimination provision, it is an "unlawful employment practice" for an employer "to discriminate against any individual . . . because of such individual's race, color, religion, sex, or national origin." §2000e–2(a). In its 1989 decision in *Price Waterhouse*, the Court sought to explain the causation standard imposed by this language. It addressed in particular what it means for an action to be taken "because of" an individual's race, religion, or nationality. Although no opinion in that case commanded a majority, six Justices did agree that a plaintiff could prevail on a claim of status-based discrimination if he or she could show that one of the prohibited traits was a "motivating" or "substantial" factor in the employer's decision. 490 U. S., at 258 (plurality opinion); *id.,* at 259 (White, J., concurring in judgment); *id.,* at 276 (O'Connor, J., concurring in judgment). If the plaintiff made that showing, the burden of persuasion would shift

to the employer, which could escape liability if it could prove that it would have taken the same employment action in the absence of all discriminatory animus. *Id.,* at 258 (plurality opinion); *id.,* at 259–260 (opinion of White, J.); *id.,* at 276–277 (opinion of O'Connor, J.). In other words, the employer had to show that a discriminatory motive was not the but-for cause of the adverse employment action.

Two years later, Congress passed the Civil Rights Act of 1991 (1991 Act), 105 Stat. 1071. This statute (which had many other provisions) codified the burden-shifting and lessened-causation framework of *Price Waterhouse* in part but also rejected it to a substantial degree. The legislation first added a new subsection to the end of §2000e–2, *i.e.,* Title VII's principal ban on status-based discrimination. See §107(a), 105 Stat. 1075. The new provision, §2000e–2(m), states:

> "[A]n unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice."

This, of course, is a lessened causation standard.

The 1991 Act also abrogated a portion of *Price Waterhouse*'s framework by removing the employer's ability to defeat liability once a plaintiff proved the existence of an impermissible motivating factor. See *Gross*, 557 U. S., at 178, n. 5. In its place, Congress enacted §2000e–5(g)(2), which provides:

> "(B) On a claim in which an individual proves a violation under section 2000e–2(m) of this title and [the employer] demonstrates that [it] would have taken the same action in the absence of the impermissible motivating factor, the court—
>
> "(i) may grant declaratory relief, injunctive relief . . .

and [limited] attorney's fees and costs . . . ; and

  "(ii) shall not award damages or issue an order requiring any admission, reinstatement, hiring, promotion, or payment . . . ."

So, in short, the 1991 Act substituted a new burden-shifting framework for the one endorsed by *Price Waterhouse*. Under that new regime, a plaintiff could obtain declaratory relief, attorney's fees and costs, and some forms of injunctive relief based solely on proof that race, color, religion, sex, or nationality was a motivating factor in the employment action; but the employer's proof that it would still have taken the same employment action would save it from monetary damages and a reinstatement order. See *Gross*, 557 U. S., at 178, n. 5; see also *id.,* at 175, n. 2, 177, n. 3.

After *Price Waterhouse* and the 1991 Act, considerable time elapsed before the Court returned again to the meaning of "because" and the problem of causation. This time it arose in the context of a different, yet similar statute, the ADEA, 29 U. S. C. §623(a). See *Gross, supra*. Much like the Title VII statute in *Price Waterhouse*, the relevant portion of the ADEA provided that "'[i]t shall be unlawful for an employer . . . to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, *because of* such individual's age.'" 557 U. S., at 176 (quoting §623(a)(1); emphasis and ellipsis in original).

Concentrating first and foremost on the meaning of the phrase "'*because of* . . . age,'" the Court in *Gross* explained that the ordinary meaning of "'because of'" is "'by reason of'" or "'on account of.'" *Id.,* at 176 (citing 1 Webster's Third New International Dictionary 194 (1966); 1 Oxford English Dictionary 746 (1933); The Random House Dictionary of the English Language 132 (1966); emphasis in

original).  Thus, the "requirement that an employer took adverse action 'because of' age [meant] that age was the 'reason' that the employer decided to act," or, in other words, that "age was the 'but-for' cause of the employer's adverse decision."  557 U. S., at 176.  See also *Safeco Ins. Co. of America* v. *Burr*, 551 U. S. 47, 63–64, and n. 14 (2007) (noting that "because of" means "based on" and that "'based on' indicates a but-for causal relationship"); *Holmes* v. *Securities Investor Protection Corporation*, 503 U. S. 258, 265–266 (1992) (equating "by reason of" with "'but for' cause").

In the course of approving this construction, *Gross* declined to adopt the interpretation endorsed by the plurality and concurring opinions in *Price Waterhouse*.  Noting that "the ADEA must be 'read . . . the way Congress wrote it,'" 557 U. S., at 179 (quoting *Meacham* v. *Knolls Atomic Power Laboratory*, 554 U. S. 84, 102 (2008)), the Court concluded that "the textual differences between Title VII and the ADEA" "prevent[ed] us from applying *Price Waterhouse* . . . to federal age discrimination claims," 557 U. S., at 175, n. 2.  In particular, the Court stressed the congressional choice not to add a provision like §2000e–2(m) to the ADEA despite making numerous other changes to the latter statute in the 1991 Act.  *Id.,* at 174–175 (citing *EEOC* v. *Arabian American Oil Co.*, 499 U. S. 244, 256 (1991)); 557 U. S., at 177, n. 3 (citing *14 Penn Plaza LLC* v. *Pyett*, 556 U. S. 247, 270 (2009)).

Finally, the Court in *Gross* held that it would not be proper to read *Price Waterhouse* as announcing a rule that applied to both statutes, despite their similar wording and near-contemporaneous enactment.  557 U. S., at 178, n. 5.  This different reading was necessary, the Court concluded, because Congress' 1991 amendments to Title VII, including its "careful tailoring of the 'motivating factor' claim" and the substitution of §2000e–5(g)(2)(B) for *Price Waterhouse*'s full affirmative defense, indicated that the moti-

vating-factor standard was not an organic part of Title VII and thus could not be read into the ADEA. See 557 U. S., at 178, n. 5.

In *Gross*, the Court was careful to restrict its analysis to the statute before it and withhold judgment on the proper resolution of a case, such as this, which arose under Title VII rather than the ADEA. But the particular confines of *Gross* do not deprive it of all persuasive force. Indeed, that opinion holds two insights for the present case. The first is textual and concerns the proper interpretation of the term "because" as it relates to the principles of causation underlying both §623(a) and §2000e–3(a). The second is the significance of Congress' structural choices in both Title VII itself and the law's 1991 amendments. These principles do not decide the present case but do inform its analysis, for the issues possess significant parallels.

### III
### A

As noted, Title VII's antiretaliation provision, which is set forth in §2000e–3(a), appears in a different section from Title VII's ban on status-based discrimination. The antiretaliation provision states, in relevant part:

> "It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

This enactment, like the statute at issue in *Gross*, makes it unlawful for an employer to take adverse employment action against an employee "because" of certain criteria. Cf. 29 U. S. C. §623(a)(1). Given the lack of any meaningful textual difference between the text in this

statute and the one in *Gross*, the proper conclusion here, as in *Gross*, is that Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action. See *Gross*, *supra,* at 176.

The principal counterargument offered by respondent and the United States relies on their different understanding of the motivating-factor section, which—on its face—applies only to status discrimination, discrimination on the basis of race, color, religion, sex, and national origin. In substance, they contend that: (1) retaliation is defined by the statute to be an unlawful employment practice; (2) §2000e–2(m) allows unlawful employment practices to be proved based on a showing that race, color, religion, sex, or national origin was a motivating factor for—and not necessarily the but-for factor in—the challenged employment action; and (3) the Court has, as a matter of course, held that "retaliation for complaining about race discrimination *is* 'discrimination based on race.'" Brief for United States as *Amicus Curiae* 14; see *id.*, at 11–14; Brief for Respondent 16–19.

There are three main flaws in this reading of §2000e–2(m). The first is that it is inconsistent with the provision's plain language. It must be acknowledged that because Title VII defines "unlawful employment practice" to include retaliation, the question presented by this case would be different if §2000e–2(m) extended its coverage to all unlawful employment practices. As actually written, however, the text of the motivating-factor provision, while it begins by referring to "unlawful employment practices," then proceeds to address only five of the seven prohibited discriminatory actions—actions based on the employee's status, *i.e.,* race, color, religion, sex, and national origin. This indicates Congress' intent to confine that provision's coverage to only those types of employment practices. The text of §2000e–2(m) says nothing about retaliation claims.

Given this clear language, it would be improper to conclude that what Congress omitted from the statute is nevertheless within its scope. *Gardner* v. *Collins*, 2 Pet. 58, 93 (1829) ("What the legislative intention was, can be derived only from the words they have used; and we cannot speculate beyond the reasonable import of these words"); see *Sebelius* v. *Cloer*, 569 U. S. \_\_\_, \_\_\_ (2013) (slip op., at 8).

The second problem with this reading is its inconsistency with the design and structure of the statute as a whole. See *Gross*, 557 U. S., at 175, n. 2, 178, n. 5. Just as Congress' choice of words is presumed to be deliberate, so too are its structural choices. See *id.,* at 177, n. 3. When Congress wrote the motivating-factor provision in 1991, it chose to insert it as a subsection within §2000e–2, which contains Title VII's ban on status-based discrimination, §§2000e–2(a) to (d), (*l*), and says nothing about retaliation. See 1991 Act, §107(a), 105 Stat. 1075 (directing that "§2000e–2 . . . [be] further amended by adding at the end the following new subsection . . . (m)"). The title of the section of the 1991 Act that created §2000e–2(m)— "Clarifying prohibition against impermissible consideration of race, color, religion, sex, or national origin in employment practices"—also indicates that Congress determined to address only claims of status-based discrimination, not retaliation. See §107(a), *id.,* at 1075.

What is more, a different portion of the 1991 Act contains an express reference to all unlawful employment actions, thereby reinforcing the conclusion that Congress acted deliberately when it omitted retaliation claims from §2000e–2(m). See *Arabian American Oil Co.,* 499 U. S., at 256 (congressional amendment of ADEA on a similar subject coupled with congressional failure to amend Title VII weighs against conclusion that the ADEA's standard applies to Title VII); see also *Gross, supra,* at 177, n. 3. The relevant portion of the 1991 Act, §109(b), allowed

certain overseas operations by U. S. employers to engage in "any practice prohibited by section 703 or 704," *i.e.,* §2000e–2 or §2000e–3, "if compliance with such section would cause such employer . . . to violate the law of the foreign country in which such workplace is located." 105 Stat. 1077.

If Congress had desired to make the motivating-factor standard applicable to all Title VII claims, it could have used language similar to that which it invoked in §109. See *Arabian American Oil Co.*, *supra*, at 256. Or, it could have inserted the motivating-factor provision as part of a section that applies to all such claims, such as §2000e–5, which establishes the rules and remedies for all Title VII enforcement actions. See *FDA* v. *Brown & Williamson Tobacco Corp.*, 529 U. S. 120, 160 (2000). But in writing §2000e–2(m), Congress did neither of those things, and "[w]e must give effect to Congress' choice." *Gross*, *supra,* at 177, n. 3.

The third problem with respondent's and the Government's reading of the motivating-factor standard is in its submission that this Court's decisions interpreting federal antidiscrimination law have, as a general matter, treated bans on status-based discrimination as also prohibiting retaliation. In support of this proposition, both respondent and the United States rely upon decisions in which this Court has "read [a] broadly worded civil rights statute . . . as including an antiretaliation remedy." *CBOCS West, Inc.* v. *Humphries*, 553 U. S. 442, 452–453 (2008). In *CBOCS*, for example, the Court held that 42 U. S. C. §1981—which declares that all persons "shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens"—prohibits not only racial discrimination but also retaliation against those who oppose it. 553 U. S., at 445. And in *Gómez-Pérez* v. *Potter*, 553 U. S. 474 (2008), the Court likewise read a bar on retaliation into the broad wording of the federal-employee provi-

sions of the ADEA. *Id.,* at 479, 487 ("All personnel actions affecting [federal] employees . . . who are at least 40 years of age . . . shall be made free from any discrimination based on age," 29 U. S. C. §633a(a)); see also *Jackson* v. *Birmingham Bd. of Ed.*, 544 U. S. 167, 173, 179 (2005) (20 U. S. C. §1681(a) (Title IX)); *Sullivan* v. *Little Hunting Park, Inc.*, 396 U. S. 229, 235, n. 3, 237 (1969) (42 U. S. C. §1982).

These decisions are not controlling here. It is true these cases do state the general proposition that Congress' enactment of a broadly phrased antidiscrimination statute may signal a concomitant intent to ban retaliation against individuals who oppose that discrimination, even where the statute does not refer to retaliation in so many words. What those cases do not support, however, is the quite different rule that every reference to race, color, creed, sex, or nationality in an antidiscrimination statute is to be treated as a synonym for "retaliation." For one thing, §2000e–2(m) is not itself a substantive bar on discrimination. Rather, it is a rule that establishes the causation standard for proving a violation defined elsewhere in Title VII. The cases cited by respondent and the Government do not address rules of this sort, and those precedents are of limited relevance here.

The approach respondent and the Government suggest is inappropriate in the context of a statute as precise, complex, and exhaustive as Title VII. As noted, the laws at issue in *CBOCS*, *Jackson*, and *Gómez-Pérez* were broad, general bars on discrimination. In interpreting them the Court concluded that by using capacious language Congress expressed the intent to bar retaliation in addition to status-based discrimination. See *Gómez-Pérez*, *supra,* at 486–488. In other words, when Congress' treatment of the subject of prohibited discrimination was both broad and brief, its omission of any specific discussion of retaliation was unremarkable.

If Title VII had likewise been phrased in broad and general terms, respondent's argument might have more force. But that is not how Title VII was written, which makes it incorrect to infer that Congress meant anything other than what the text does say on the subject of retaliation. Unlike Title IX, §1981, §1982, and the federal-sector provisions of the ADEA, Title VII is a detailed statutory scheme. This statute enumerates specific unlawful employment practices. See §§2000e–2(a)(1), (b), (c)(1), (d) (status-based discrimination by employers, employment agencies, labor organizations, and training programs, respectively); §2000e–2(*l*) (status-based discrimination in employment-related testing); §2000e–3(a) (retaliation for opposing, or making or supporting a complaint about, unlawful employment actions); §2000e–3(b) (advertising a preference for applicants of a particular race, color, religion, sex, or national origin). It defines key terms, see §2000e, and exempts certain types of employers, see §2000e–1. And it creates an administrative agency with both rulemaking and enforcement authority. See §§2000e–5, 2000e–12.

This fundamental difference in statutory structure renders inapposite decisions which treated retaliation as an implicit corollary of status-based discrimination. Text may not be divorced from context. In light of Congress' special care in drawing so precise a statutory scheme, it would be improper to indulge respondent's suggestion that Congress meant to incorporate the default rules that apply only when Congress writes a broad and undifferentiated statute. See *Gómez-Pérez, supra,* at 486–488 (when construing the broadly worded federal-sector provision of the ADEA, Court refused to draw inferences from Congress' amendments to the detailed private-sector provisions); *Arabian American Oil Co.*, 499 U. S., at 256; cf. *Jackson, supra,* at 175 (distinguishing Title IX's "broadly written general prohibition on discrimination" from Title VII's

"greater detail [with respect to] the conduct that constitutes discrimination").

Further confirmation of the inapplicability of §2000e–2(m) to retaliation claims may be found in Congress' approach to the Americans with Disabilities Act of 1990 (ADA), 104 Stat. 327. In the ADA Congress provided not just a general prohibition on discrimination "because of [an individual's] disability," but also seven paragraphs of detailed description of the practices that would constitute the prohibited discrimination, see §§102(a), (b)(1)–(7), *id.*, at 331–332 (codified at 42 U. S. C. §12112). And, most pertinent for present purposes, it included an express antiretaliation provision, see §503(a), 104 Stat. 370 (codified at 42 U. S. C. §12203). That law, which Congress passed only a year before enacting §2000e–2(m) and which speaks in clear and direct terms to the question of retaliation, rebuts the claim that Congress must have intended to use the phrase "race, color, religion, sex, or national origin" as the textual equivalent of "retaliation." To the contrary, the ADA shows that when Congress elected to address retaliation as part of a detailed statutory scheme, it did so in clear textual terms.

The Court confronted a similar structural dispute in *Lehman* v. *Nakshian*, 453 U. S. 156 (1981). The question there was whether the federal-employment provisions of the ADEA, 29 U. S. C. §633a, provided a jury-trial right for claims against the Federal Government. *Nakshian*, 453 U. S., at 157. In concluding that it did not, the Court noted that the portion of the ADEA that prohibited age discrimination by private, state, and local employers, §626, expressly provided for a jury trial, whereas the federal-sector provisions said nothing about such a right. *Id.*, at 162–163, 168. So, too, here. Congress has in explicit terms altered the standard of causation for one class of claims but not another, despite the obvious opportunity to do so in the 1991 Act.

B

The proper interpretation and implementation of §2000e–3(a) and its causation standard have central importance to the fair and responsible allocation of resources in the judicial and litigation systems. This is of particular significance because claims of retaliation are being made with ever-increasing frequency. The number of these claims filed with the Equal Employment Opportunity Commission (EEOC) has nearly doubled in the past 15 years—from just over 16,000 in 1997 to over 31,000 in 2012. EEOC, Charge Statistics FY 1997 Through FY 2012, http://www.eeoc.gov/eeoc/statistics/enforcement/charges.cfm (as visited June 20, 2013, and available in Clerk of Court's case file). Indeed, the number of retaliation claims filed with the EEOC has now outstripped those for every type of status-based discrimination except race. See *ibid.*

In addition lessening the causation standard could also contribute to the filing of frivolous claims, which would siphon resources from efforts by employer, administrative agencies, and courts to combat workplace harassment. Consider in this regard the case of an employee who knows that he or she is about to be fired for poor performance, given a lower pay grade, or even just transferred to a different assignment or location. To forestall that lawful action, he or she might be tempted to make an unfounded charge of racial, sexual, or religious discrimination; then, when the unrelated employment action comes, the employee could allege that it is retaliation. If respondent were to prevail in his argument here, that claim could be established by a lessened causation standard, all in order to prevent the undesired change in employment circumstances. Even if the employer could escape judgment after trial, the lessened causation standard would make it far more difficult to dismiss dubious claims at the summary judgment stage. Cf. *Vance* v. *Ball State Univ.*, *post,* at 9–

11. It would be inconsistent with the structure and opera-
tion of Title VII to so raise the costs, both financial and
reputational, on an employer whose actions were not in
fact the result of any discriminatory or retaliatory intent.
See Brief for National School Boards Association as *Ami-
cus Curiae* 11–22. Yet there would be a significant risk of
that consequence if respondent's position were adopted
here.

The facts of this case also demonstrate the legal and
factual distinctions between status-based and retaliation
claims, as well as the importance of the correct standard of
proof. Respondent raised both claims in the District
Court. The alleged wrongdoer differed in each: In re-
spondent's status-based discrimination claim, it was his
indirect supervisor, Dr. Levine. In his retaliation claim, it
was the Chair of Internal Medicine, Dr. Fitz. The proof
required for each claim differed, too. For the status-based
claim, respondent was required to show instances of racial
slurs, disparate treatment, and other indications of
nationality-driven animus by Dr. Levine. Respondent's
retaliation claim, by contrast, relied on the theory that Dr.
Fitz was committed to exonerating Dr. Levine and wished
to punish respondent for besmirching her reputation.
Separately instructed on each type of claim, the jury re-
turned a separate verdict for each, albeit with a single
damages award. And the Court of Appeals treated each
claim separately, too, finding insufficient evidence on the
claim of status-based discrimination.

If it were proper to apply the motivating-factor standard
to respondent's retaliation claim, the University might
well be subject to liability on account of Dr. Fitz's alleged
desire to exonerate Dr. Levine, even if it could also be
shown that the terms of the affiliation agreement pre-
cluded the Hospital's hiring of respondent and that the
University would have sought to prevent respondent's
hiring in order to honor that agreement in any event. That

20     UNIVERSITY OF TEX. SOUTHWESTERN MEDICAL
CENTER *v.* NASSAR
Opinion of the Court

result would be inconsistent with the both the text and purpose of Title VII.

In sum, Title VII defines the term "unlawful employment practice" as discrimination on the basis of any of seven prohibited criteria: race, color, religion, sex, national origin, opposition to employment discrimination, and submitting or supporting a complaint about employment discrimination. The text of §2000e–2(m) mentions just the first five of these factors, the status-based ones; and it omits the final two, which deal with retaliation. When it added §2000e–2(m) to Title VII in 1991, Congress inserted it within the section of the statute that deals only with those same five criteria, not the section that deals with retaliation claims or one of the sections that apply to all claims of unlawful employment practices. And while the Court has inferred a congressional intent to prohibit retaliation when confronted with broadly worded antidiscrimination statutes, Title VII's detailed structure makes that inference inappropriate here. Based on these textual and structural indications, the Court now concludes as follows: Title VII retaliation claims must be proved according to traditional principles of but-for causation, not the lessened causation test stated in §2000e–2(m). This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer.

## IV

Respondent and the Government also argue that applying the motivating-factor provision's lessened causation standard to retaliation claims would be consistent with longstanding agency views, contained in a guidance manual published by the EEOC. It urges that those views are entitled to deference under this Court's decision in *Skidmore* v. *Swift & Co.*, 323 U. S. 134 (1944). See *National Railroad Passenger Corporation* v. *Morgan*, 536 U. S. 101,

110, n. 6 (2002). The weight of deference afforded to agency interpretations under *Skidmore* depends upon "the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade." 323 U. S., at 140; see *Vance*, *post*, at 9, n. 4.

According to the manual in question, the causation element of a retaliation claim is satisfied if "there is credible direct evidence that retaliation was a motive for the challenged action," regardless of whether there is also "[e]vidence as to [a] legitimate motive." 2 EEOC Compliance Manual §8–II(E)(1), pp. 614:0007–614:0008 (Mar. 2003). After noting a division of authority as to whether motivating-factor or but-for causation should apply to retaliation claims, the manual offers two rationales in support of adopting the former standard. The first is that "[c]ourts have long held that the evidentiary framework for proving [status-based] discrimination . . . also applies to claims of discrimination based on retaliation." *Id.*, at 614:0008, n. 45. Second, the manual states that "an interpretation . . . that permits proven retaliation to go unpunished undermines the purpose of the anti-retaliation provisions of maintaining unfettered access to the statutory remedial mechanism." *Ibid.*

These explanations lack the persuasive force that is a necessary precondition to deference under *Skidmore*. See 323 U. S., at 140; *Vance*, *post,* at 9, n. 4. As to the first rationale, while the settled judicial construction of a particular statute is of course relevant in ascertaining statutory meaning, see *Lorillard* v. *Pons*, 434 U. S. 575, 580–581 (1978), the manual's discussion fails to address the particular interplay among the status-based discrimination provision (§2000e–2(a)), the antiretaliation provision (§2000e–3(a)), and the motivating-factor provision (§2000e–2(m)). Other federal antidiscrimination statutes do not have the structure of statutory subsections that

control the outcome at issue here. The manual's failure to address the specific provisions of this statutory scheme, coupled with the generic nature of its discussion of the causation standards for status-based discrimination and retaliation claims, call the manual's conclusions into serious question. See *Kentucky Retirement Systems* v. *EEOC*, 554 U. S. 135, 149–150 (2008).

The manual's second argument is unpersuasive, too; for its reasoning is circular. It asserts the lessened causation standard is necessary in order to prevent "proven retaliation" from "go[ing] unpunished." 2 EEOC Compliance Manual §8–II(E)(1), at 614:0008, n. 45. Yet this assumes the answer to the central question at issue here, which is what causal relationship must be shown in order to prove retaliation.

Respondent's final argument, in which he is not joined by the United States, is that even if §2000e–2(m) does not control the outcome in this case, the standard applied by *Price Waterhouse* should control instead. That assertion is incorrect. First, this position is foreclosed by the 1991 Act's amendments to Title VII. As noted above, *Price Waterhouse* adopted a complex burden-shifting framework. Congress displaced this framework by enacting §2000e–2(m) (which adopts the motivating-factor standard for status-based discrimination claims) and §2000e–5(g)(2)(B) (which replaces employers' total defense with a remedial limitation). See *Gross*, 557 U. S., at 175, n. 2, 177, n. 3, 178, n. 5. Given the careful balance of lessened causation and reduced remedies Congress struck in the 1991 Act, there is no reason to think that the different balance articulated by *Price Waterhouse* somehow survived that legislation's passage. Second, even if this argument were still available, it would be inconsistent with the *Gross* Court's reading (and the plain textual meaning) of the word "because" as it appears in both §623(a) and §2000e–3(a). See *Gross*, *supra*, at 176–177. For these

reasons, the rule of *Price Waterhouse* is not controlling here.

## V

The text, structure, and history of Title VII demonstrate that a plaintiff making a retaliation claim under §2000e–3(a) must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer. The University claims that a fair application of this standard, which is more demanding than the motivating-factor standard adopted by the Court of Appeals, entitles it to judgment as a matter of law. It asks the Court to so hold. That question, however, is better suited to resolution by courts closer to the facts of this case. The judgment of the Court of Appeals for the Fifth Circuit is vacated, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 12–484

_____

## UNIVERSITY OF TEXAS SOUTHWESTERN MEDICAL CENTER, PETITIONER *v.* NAIEL NASSAR

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIFTH CIRCUIT

[June 24, 2013]

JUSTICE GINSBURG, with whom JUSTICE BREYER, JUS-
TICE SOTOMAYOR, and JUSTICE KAGAN join, dissenting.

Title VII of the Civil Rights Act of 1964, 42 U. S. C.
§2000e *et seq.*, makes it an "unlawful employment prac-
tice" to "discriminate against any individual . . . *because of*
such individual's race, color, religion, sex, or national
origin." §2000e–2(a) (emphasis added). Backing up that
core provision, Title VII also makes it an "unlawful em-
ployment practice" to discriminate against any individual
"*because*" the individual has complained of, opposed, or
participated in a proceeding about, prohibited discrimina-
tion. §2000e–3(a) (emphasis added). This form of discrim-
ination is commonly called "retaliation," although Title VII
itself does not use that term. The Court has recognized
that effective protection against retaliation, the office of
§2000e–3(a), is essential to securing "a workplace where
individuals are not discriminated against because of their
racial, ethnic, religious, or gender-based status." *Burling-
ton N. & S. F. R. Co.* v. *White*, 548 U. S. 53, 63 (2006)
(*Burlington Northern*). That is so because "fear of retalia-
tion is the leading reason why people stay silent" about
the discrimination they have encountered or observed.
*Crawford* v. *Metropolitan Government of Nashville and
Davidson Cty.*, 555 U. S. 271, 279 (2009) (internal quota-
tion marks and brackets omitted).

Similarly worded, the ban on discrimination and the ban on retaliation against a discrimination complainant have traveled together: Title VII plaintiffs often raise the two provisions in tandem.  Today's decision, however, drives a wedge between the twin safeguards in so-called "mixed-motive" cases.  To establish discrimination, all agree, the complaining party need show only that race, color, religion, sex, or national origin was "a motivating factor" in an employer's adverse action; an employer's proof that "other factors also motivated the [action]" will not defeat the discrimination claim.  §2000e–2(m).  But a retaliation claim, the Court insists, must meet a stricter standard: The claim will fail unless the complainant shows "but-for" causation, *i.e.*, that the employer would not have taken the adverse employment action but for a design to retaliate.

In so reining in retaliation claims, the Court misapprehends what our decisions teach: Retaliation for complaining about discrimination is tightly bonded to the core prohibition and cannot be disassociated from it.  Indeed, this Court has explained again and again that "retaliation in response to a complaint about [proscribed] discrimination *is* discrimination" on the basis of the characteristic Congress sought to immunize against adverse employment action.  *Jackson* v. *Birmingham Bd. of Ed.*, 544 U. S. 167, 179, n. 3 (2005) (emphasis added; internal quotation marks omitted).

The Court shows little regard for the trial judges who will be obliged to charge discrete causation standards when a claim of discrimination "because of," *e.g.*, race is coupled with a claim of discrimination "because" the individual has complained of race discrimination.  And jurors will puzzle over the rhyme or reason for the dual standards.  Of graver concern, the Court has seized on a provision, §2000e–2(m), adopted by Congress as part of an endeavor to strengthen Title VII, and turned it into a measure reducing the force of the ban on retaliation.

I

Dr. Naiel Nassar is of Middle Eastern descent. A specialist in the treatment of HIV/AIDS, Nassar was a faculty member of the University of Texas Southwestern Medical Center (UTSW) from 1995 until 2006, save for a period during which he left his employment to continue his education. UTSW is affiliated with Parkland Hospital and, like other faculty members at the University, Nassar also worked as a physician at the Hospital. Beginning in 2001, Nassar served as Associate Medical Director of the Hospital's Amelia Court Clinic.

Until 2004, Dr. Phillip Keiser, Medical Director of the Clinic, was Nassar's principal supervisor. In that year, UTSW hired Dr. Beth Levine to oversee the Clinic and to supervise Keiser. Before Levine commenced her employment at UTSW, she interviewed her potential subordinates. Meeting with other Clinic doctors for only 15 to 20 minutes, Levine spent an hour and a half with Nassar, engaging in a detailed review of his resume and reading from a list of prepared questions. Record 2926–2928.

Once Levine came on board, she expressed concern to Keiser about Nassar's productivity and questioned his work ethic. *Id.*, at 2361–2362. According to Keiser, Levine "never seemed to [be] satisf[ied]" with his assurances that Nassar was in fact working harder than other physicians. *Id.*, at 2362. Disconcerted by Levine's scrutiny, Nassar several times complained about it to Levine's supervisor, Dr. Gregory Fitz, Chair of Internal Medicine. App. to Pet. for Cert. 4.

In 2005, Levine opposed hiring another physician who, like Nassar, was of Middle Eastern descent. In Keiser's presence, Levine remarked that "Middle Easterners are lazy." *Id.*, at 3. When that physician was hired by Parkland, Levine said, again in Keiser's presence, that the Hospital had "hired another one." *Ibid.* See also Record 2399–2400. Keiser presented to Levine objective data

demonstrating Nassar's high productivity. Levine then began criticizing Nassar's billing practices. Her criticism did not take into account that Nassar's salary was funded by a federal grant that precluded billing for most of his services. App. to Pet. for Cert. 3.

Because of Levine's hostility, Nassar sought a way to continue working at the Clinic without falling under her supervision. To that end, Nassar engaged in discussions with the Hospital about dropping his affiliation with UTSW and retaining his post at Parkland. Although he was initially told that an affiliation agreement between UTSW and Parkland obliged Parkland to fill its staff physician posts with UTSW faculty, talks with the Hospital continued. Eventually, Parkland verbally offered Nassar a position as a staff physician. See App. 67–71, 214–216, 326–330.

In July 2006, Nassar resigned from his position at UTSW. "The primary reason [for his] resignation," Nassar wrote in a letter to Fitz, "[was] the continuing harassment and discrimination . . . by . . . Dr. Beth Levine." App. to Pet. for Cert. 5 (internal quotation marks omitted). According to Keiser, Nassar's letter shocked Fitz, who told Keiser that, because Levine had been "publicly humiliated," she should be "publicly exonerated." App. 41. Fitz's opposition to Parkland's hiring Nassar prompted the Hospital to withdraw the offer to engage him. App. to Pet. for Cert. 5–6.

After accepting a position at a smaller HIV/AIDS clinic in Fresno, California, Nassar filed a complaint with the Equal Employment Opportunity Commission (EEOC). The agency found "credibl[e] testimonial evidence," that UTSW had retaliated against Nassar for his allegations of discrimination by Levine. Brief for Respondent 8 (citing Pl. Trial Exh. 78). Nassar then filed suit in District Court alleging that UTSW had discriminated against him, in violation of Title VII, on the basis of his race, religion, and

national origin, see §2000e–2(a), and had constructively discharged him. App. to Pet. for Cert. 6; Complaint ¶23. He further alleged that UTSW had retaliated against him for complaining about Levine's behavior. App. to Pet. for Cert. 6.

On the retaliation claim, the District Court instructed the jury that Nassar "[did] not have to prove that retaliation was [UTSW's] only motive, but he [had to] prove that [UTSW] acted at least in part to retaliate." *Id.*, at 47. The jury found UTSW liable for both constructive discharge and retaliation. At the remedial phase, the judge charged the jury not to award damages for "actions which [UTSW] prove[d] by a preponderance of the evidence . . . it would have taken even if it had not considered . . . Nassar's protected activity." *Id.*, at 42–43. Finding that UTSW had not met its proof burden, the jury awarded Nassar $438,167.66 in backpay and $3,187,500 in compensatory damages. *Id.*, at 43–44.[1]

The Court of Appeals for the Fifth Circuit affirmed in part.[2] Responding to UTSW's argument that the District Court erred in instructing the jury on a mixed-motive theory of retaliation, the Fifth Circuit held that the instruction conformed to Circuit precedent. 674 F. 3d 448, 454, n. 16 (2012) (citing *Smith* v. *Xerox Corp.*, 602 F. 3d 320, 330 (2010)).[3]

---

[1] The District Court reduced compensatory damages to $300,000, the statutory cap under Title VII. See 42 U. S. C. §1981a(b)(3)(D).

[2] The Court of Appeals found the evidence insufficient to support the claim of constructive discharge and reversed the District Court's judgment to that extent. See App. to Pet. for Cert. 8–10. That ruling is not contested here.

[3] The Fifth Circuit has since reversed course in an unpublished opinion, concluding that §2000e–2(m)'s motivating-factor prescription does not apply to retaliation claims. See *Carter* v. *Luminant Power Servs. Co.*, No. 12–10642, 2013 WL 1337365 (Apr. 3, 2013).

## II

This Court has long acknowledged the symbiotic relationship between proscriptions on discrimination and proscriptions on retaliation. Antidiscrimination provisions, the Court has reasoned, endeavor to create a workplace where individuals are not treated differently on account of race, ethnicity, religion, or sex. See *Burlington Northern*, 548 U. S., at 63. Antiretaliation provisions "see[k] to secure that primary objective by preventing an employer from interfering . . . with an employee's efforts to secure or advance enforcement of [antidiscrimination] guarantees." *Ibid.* As the Court has comprehended, "Title VII depends for its enforcement upon the cooperation of employees who are willing to file complaints and act as witnesses." *Id.*, at 67. "'[E]ffective enforcement,'" therefore, can "'only be expected if employees . . . [feel] free to approach officials with their grievances.'" *Ibid.* (quoting *Mitchell* v. *Robert DeMario Jewelry, Inc.*, 361 U. S. 288, 292 (1960)). See also *Crawford*, 555 U. S., at 279.

Adverting to the close connection between discrimination and retaliation for complaining about discrimination, this Court has held, in a line of decisions unbroken until today, that a ban on discrimination encompasses retaliation. In *Sullivan* v. *Little Hunting Park, Inc.*, 396 U. S. 229, 237 (1969), the Court determined that 42 U. S. C. §1982, which provides that "[a]ll citizens of the United States shall have the same right . . . as is enjoyed by white citizens . . . to inherit, purchase, lease, sell, hold, and convey real and personal property," protected a white man who suffered retaliation after complaining of discrimination against his black tenant. *Jackson* v. *Birmingham Board of Education* elaborated on that holding in the context of sex discrimination. "Retaliation against a person because [he] has complained of sex discrimination," the Court found it inescapably evident, "is another form of intentional sex discrimination." 544 U. S., at 173. As the

Court explained:

> "Retaliation is, by definition, an intentional act. It is a form of 'discrimination' because the complainant is being subject to differential treatment. Moreover, retaliation is discrimination 'on the basis of sex' because it is an intentional response to the nature of the complaint: an allegation of sex discrimination." *Id.*, at 173–174 (citations omitted).

*Jackson* interpreted Title IX of the Educational Amendments of 1972, 20 U. S. C. §1681(a). Noting that the legislation followed three years after *Sullivan*, the Court found it "not only appropriate but also realistic to presume that Congress was thoroughly familiar with *Sullivan* and . . . expected its enactment of Title IX to be interpreted in conformity with it." 544 U. S., at 176 (internal quotation marks and alterations omitted).

*Gómez-Pérez* v. *Potter*, 553 U. S. 474 (2008), was similarly reasoned. The Court there held that the federal-sector provision of the Age Discrimination in Employment Act of 1967 (ADEA), 29 U. S. C. §633a(a), barring discrimination "based on age," also proscribes retaliation. 553 U. S., at 479–491. "What *Jackson* said about the relationship between *Sullivan* and the enactment of Title IX," the Court observed, "can be said as well about the relationship between *Sullivan* and the enactment of the ADEA's federal-sector provision." *Id.*, at 485. See also *CBOCS West, Inc.* v. *Humphries*, 553 U. S. 442, 447–457 (2008) (retaliation for race discrimination constitutes discrimination based on race under 42 U. S. C. §1981). There is no sound reason in this case to stray from the decisions in *Sullivan*, *Jackson*, *Gómez-Pérez*, and *CBOCS West*.

### III
#### A

The Title VII provision key here, §2000e–2(m), states that "an unlawful employment practice is established

when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." Section 2000e–2(m) was enacted as part of the Civil Rights Act of 1991, which amended Title VII, along with other federal antidiscrimination statutes. See 105 Stat. 1071. The amendments were intended to provide "additional protections against unlawful discrimination in employment," *id.*, §2(3), and to "respon[d] to a number of . . . decisions by [this Court] that sharply cut back on the scope and effectiveness" of antidiscrimination laws, H. R. Rep. No. 102–40, pt. II, pp. 2–4 (1991) (hereinafter House Report Part II) (citing, *inter alia*, *Patterson* v. *McLean Credit Union*, 491 U. S. 164 (1989); *Martin* v. *Wilks*, 490 U. S. 755 (1989); *Lorance* v. *AT&T Technologies, Inc.*, 490 U. S. 900 (1989)).

Among the decisions found inadequately protective was *Price Waterhouse* v. *Hopkins*, 490 U. S. 228 (1989). A plurality of the Court in that case held that the words "because of" in §2000e–2(a) encompass claims challenging an employment decision attributable to "mixed motives," *i.e.*, one motivated by both legitimate and illegitimate factors. See *id.*, at 240–242.[4] A Title VII plaintiff, the plurality concluded, need show only that a prohibited factor contributed to the employment decision—not that it was the but-for or sole cause. *Id.*, at 240–244. But see *id.*, at 281–282 (KENNEDY, J., dissenting). An employer would not be liable, however, if it could show by a preponderance of the evidence that it would have taken the same action absent the illegitimate motive. *Id.*, at 244–245.

———————

[4] Justices White and O'Connor separately concurred and would have required the Title VII plaintiff to show that protected characteristics constituted a *substantial* motivating factor in the adverse employment decision. See *Price Waterhouse* v. *Hopkins*, 490 U. S. 228, 259 (1989) (White, J., concurring in judgment); *id.*, at 265 (O'Connor, J., concurring in judgment).

Congress endorsed the plurality's conclusion that, to be actionable under Title VII, discrimination must be a motivating factor in, but need not be the but-for cause of, an adverse employment action. See House Report Part II, at 18. Congress disagreed with the Court, however, insofar as the *Price Waterhouse* decision allowed an employer to escape liability by showing that the same action would have been taken regardless of improper motive. House Report Part II, at 18. See also H. R. Rep. No. 102–40, pt. I, pp. 45–48 (1991) (hereinafter House Report Part I). "If Title VII's ban on discrimination in employment is to be meaningful," the House Report explained, "victims of intentional discrimination must be able to obtain relief, and perpetrators of discrimination must be held liable for their actions." House Report Part II, at 18.

Superseding *Price Waterhouse* in part, Congress sought to "restore" the rule of decision followed by several Circuits that any discrimination "actually shown to play a role in a contested employment decision may be the subject of liability." House Report Part II, at 18. See also House Report Part I, at 48. To that end, Congress enacted §2000e–2(m) and §2000e–5(g)(2)(B). The latter provides that an employer's proof that an adverse employment action would have been taken in any event does not shield the employer from liability; such proof, however, limits the plaintiff's remedies to declaratory or injunctive relief, attorney's fees, and costs.

Critically, the rule Congress intended to "restore" was not limited to substantive discrimination. As the House Report explained, "the Committee endors[ed] . . . the decisional law" in *Bibbs* v. *Block*, 778 F. 2d 1318 (CA8 1985) (en banc), which held that a violation of Title VII is established when the trier of fact determines that "an unlawful motive played some part in the employment decision or decisional process." *Id.*, at 1323; see House Report Part I, at 48. Prior to the 1991 Civil Rights Act,

*Bibbs* had been applied to retaliation claims. See, *e.g.*, *Johnson* v. *Legal Servs. of Arkansas, Inc.*, 813 F. 2d 893, 900 (CA8 1987) ("Should the court find that retaliation played some invidious part in the [plaintiff's] termination, a violation of Title VII will be established under *Bibbs*."). See also *EEOC* v. *General Lines, Inc.*, 865 F. 2d 1555, 1560 (CA10 1989).

B

There is scant reason to think that, despite Congress' aim to "restore and strengthen . . . laws that ban discrimination in employment," House Report Part II, at 2, Congress meant to exclude retaliation claims from the newly enacted "motivating factor" provision. Section 2000e–2(m) provides that an "unlawful employment practice is established" when the plaintiff shows that a protected characteristic was a factor driving "any employment practice." Title VII, in §2000e–3(a), explicitly denominates retaliation, like status-based discrimination, an "unlawful employment practice." Because "any employment practice" necessarily encompasses practices prohibited under §2000e–3(a), §2000e–2(m), by its plain terms, covers retaliation.

Notably, when it enacted §2000e–2(m), Congress did not tie the new provision specifically to §§2000e–2(a)–(d), which proscribe discrimination "because of" race, color, religion, gender, or national origin. Rather, Congress added an entirely new provision to codify the causation standard, one encompassing "any employment practice." §2000e–2(m).

Also telling, §2000e–2(m) is not limited to situations in which *the complainant's* race, color, religion, sex, or national origin motivates the employer's action. In contrast, Title VII's substantive antidiscrimination provisions refer to the protected characteristics of the complaining party. See §§2000e–2(a)(1)–(2), (c)(2) (referring to "such individu-

al's" protected characteristics); §§2000e–2(b), (c)(1), (d) (referring to "his race, color, religion, sex, or national origin"). Congress thus knew how to limit Title VII's coverage to victims of status-based discrimination when it was so minded. It chose, instead, to bring within §2000e–2(m) "any employment practice." To cut out retaliation from §2000e–2(m)'s scope, one must be blind to that choice. Cf. *Jackson*, 544 U. S., at 179, n. 3 (omission of reference to the complaining party's sex in Title IX supports the conclusion that the statute protects a male plaintiff from retaliation in response to complaints about sex discrimination against women).

C

From the inception of §2000e–2(m), the agency entrusted with interpretation of Title VII and superintendence of the Act's administration, the EEOC, see §2000e–5, has understood the provision to cover retaliation claims. Shortly after Congress amended Title VII to include the motivating-factor provision, the EEOC issued guidance advising that, "[a]lthough [§2000e–2(m)] does not specify retaliation as a basis for finding liability whenever it is a motivating factor for an action, neither does it suggest any basis for deviating from the Commission's long-standing rule that it will find liability . . . whenever retaliation plays any role in an employment decision." EEOC, Revised Enforcement Guidance on Recent Developments in Disparate Treatment Theory, p. 20, n. 14 (July 14, 1992) (hereinafter EEOC Guidance), available at http://www.eeoc.gov/policy/docs/disparat.html (as visited June 21, 2013, and in Clerk of Court's case file). As the EEOC's initial guidance explained, "if retaliation were to go unremedied, it would have a chilling effect upon the willingness of individuals to speak out against employment discrimination." *Ibid.*

In its compliance manual, the EEOC elaborated on its

conclusion that "[§2000e–2(m)] applies to retaliation." 2 EEOC Compliance Manual §8–II(E)(1), p. 614:0008, n. 45 (May 20, 1998) (hereinafter EEOC Compliance Manual). That reading, the agency observed, tracked the view, widely held by courts, "that the evidentiary framework for proving employment discrimination based on race, sex, or other protected class status also applies to claims of discrimination based on retaliation." *Ibid.* "[A]n interpretation of [§2000e–2(m)] that permit[ted] proven retaliation to go unpunished," the EEOC noted, would "undermin[e] the purpose of the anti-retaliation provisions of maintaining unfettered access to the statutory remedial mechanism." *Ibid.*

The position set out in the EEOC's guidance and compliance manual merits respect. See *Skidmore* v. *Swift & Co.*, 323 U. S. 134, 140 (1944); *Federal Express Corp.* v. *Holowecki*, 552 U. S. 389, 399 (2008) ("[EEOC's] policy statements, embodied in its compliance manual and internal directives . . . reflect a body of experience and informed judgment. . . . As such, they are entitled to a measure of respect under the less deferential *Skidmore* standard." (internal quotation marks omitted)). If the breadth of §2000e–2(m) can be deemed ambiguous (although I believe its meaning is plain), the provision should be construed to accord with the EEOC's well-reasoned and longstanding guidance.

## IV

The Court draws the opposite conclusion, ruling that retaliation falls outside the scope of §2000e–2(m). In so holding, the Court ascribes to Congress the unlikely purpose of separating retaliation claims from discrimination claims, thereby undermining the Legislature's effort to fortify the protections of Title VII. None of the reasons the Court offers in support of its restrictive interpretation of §2000e–2(m) survives inspection.

A

The Court first asserts that reading §2000e–2(m) to encompass claims for retaliation "is inconsistent with the provision's plain language." *Ante*, at 12. The Court acknowledges, however, that "the text of the motivating-factor provision . . . begins by referring to unlawful employment practices," a term that undeniably includes retaliation. *Ibid.* (internal quotation marks omitted). Nevermind that, the Court continues, for §2000e–2(m) goes on to reference as "motivating factor[s]" only "race, color, religion, sex, or national origin." The Court thus sees retaliation as a protected activity entirely discrete from status-based discrimination. *Ibid.*

This vision of retaliation as a separate concept runs up against precedent. See *supra*, at 6–7. Until today, the Court has been clear eyed on just what retaliation is: a manifestation of status-based discrimination. As *Jackson* explained in the context of sex discrimination, "retaliation is discrimination 'on the basis of sex' because it is an intentional response to the nature of the complaint: an allegation of sex discrimination." 544 U. S., at 174.

The Court does not take issue with *Jackson*'s insight. Instead, it distinguishes *Jackson* and like cases on the ground that they concerned laws in which "Congress' treatment of the subject of prohibited discrimination was both broad and brief." *Ante*, at 15. Title VII, by contrast, "is a detailed statutory scheme," that "enumerates specific unlawful employment practices," "defines key terms," and "exempts certain types of employers." *Ante*, at 16. Accordingly, the Court says, "it would be improper to indulge [the] suggestion that Congress meant to incorporate [in Title VII] the default rules that apply only when Congress writes a broad and undifferentiated statute." *Ibid.*

It is strange logic indeed to conclude that when Congress homed in on retaliation and codified the proscription, as it did in Title VII, Congress meant protection

against that unlawful employment practice to have *less* force than the protection available when the statute does not mention retaliation. It is hardly surprising, then, that our jurisprudence does not support the Court's conclusion. In *Gómez-Pérez*, the Court construed the federal-sector provision of the ADEA, which proscribes "discrimination based on age," 29 U. S. C. §633a(a), to bar retaliation. The Court did so mindful that another part of the Act, the provision applicable to private-sector employees, explicitly proscribes retaliation and, moreover, "set[s] out a specific list of forbidden employer practices." *Gómez-Pérez*, 553 U. S., at 486–487 (citing 29 U. S. C. §§623(a) and (d)).

The Court suggests that "the la[w] at issue in . . . *Gómez-Pérez* [was a] broad, general ba[r] on discrimination." *Ante*, at 15. But, as our opinion in that case observes, some of the ADEA's provisions are brief, broad, and general, while others are extensive, specific, and detailed. 553 U. S., at 487. So too of Title VII. See *ibid.* ("The ADEA federal-sector provision was patterned directly after Title VII's federal-sector discrimination ban . . . [which] contains a broad prohibition of 'discrimination,' rather than a list of specific prohibited practices." (some internal quotation marks omitted)). It makes little sense to apply a different mode of analysis to Title VII's §2000e–2(m) and the ADEA's §633a(a), both brief statements on discrimination in the context of larger statutory schemes.[5]

_____

[5] The Court obscures the inconsistency between today's opinion and *Gómez-Pérez* by comparing §633a to *all of* Title VII. See *ante*, at 16 ("Unlike Title IX, §1981, §1982, and the federal-sector provisions of the ADEA, Title VII is a detailed statutory scheme."). That comparison is inapt. Like Title VII, the ADEA is a "detailed statutory scheme." *Ibid.* Compare *ibid.* (citing Title VII provisions that proscribe status-based discrimination by employers, employment agencies, labor organizations, and training programs; bar retaliation; prohibit advertising a preference for certain protected characteristics; define terms; exempt certain employers; and create an agency with rulemaking and enforcement authority), with 29 U. S. C. §§623(a)–(e) (proscribing age discrim-

The Court's reliance on §109(b) of the Civil Rights Act of 1991, 105 Stat. 1077,[6] and the Americans with Disabilities Act of 1990 (ADA), 104 Stat. 327, is similarly unavailing. According to the Court, Congress' explicit reference to §2000e–3(a) in §109(b) "reinforc[es] the conclusion that Congress acted deliberately when it omitted retaliation claims from §2000e–2(m)." *Ante*, at 13. The same is true of the ADA, the Court says, as "Congress provided not just a general prohibition on discrimination 'because of [an individual's] disability,' but also seven paragraphs of detailed description of the practices that would constitute the prohibited discrimination . . . [a]nd . . . an express antiretaliation provision." *Ante*, at 17.

This argument is underwhelming. Yes, Congress has sometimes addressed retaliation explicitly in antidiscrimination statutes. When it does so, there is no occasion for interpretation. But when Congress simply targets discrimination "because of" protected characteristics, or, as in §2000e–2(m), refers to employment practices motivated by race, color, religion, sex, or national origin, how should courts comprehend those phrases? They should read them informed by this Court's consistent holdings that such phrases draw in retaliation, for, in truth, retaliation is a

———————

ination by employers, employment agencies, and labor unions; barring retaliation; prohibiting advertising a preference for employees of a particular age), §628 (granting rulemaking authority to the EEOC), and §630 (defining terms). Thus, §633a is just like §2000e–2(m) in the relevant respect: both are single provisions comprised within a detailed scheme.

[6] Now codified at 42 U. S. C. §2000e–1(b), §109(b) provides:

"It shall not be unlawful under §2000e–2 or 2000e–3 . . . for an employer . . . to take any action otherwise prohibited by such section, with respect to an employee in a workplace in a foreign country if compliance with such section would cause such employer . . . to violate the law of the foreign country in which such workplace is located." The provision was framed to accord with this Court's decision in *EEOC* v. *Arabian American Oil Co.*, 499 U. S. 244 (1991).

"form of intentional [status-based] discrimination."  See
*Jackson*, 544 U. S., at 173, described *supra*, at 6–7.  That
is why the Court can point to no prior instance in which an
antidiscrimination law was found *not* to cover retaliation.
The Court's *volte-face* is particularly imprudent in the
context of §2000e–2(m), a provision added as part of Con-
gress' effort to toughen protections against workplace
discrimination.

## B

The Court also disassociates retaliation from status-
based discrimination by stressing that the bar on the
latter appears in §2000e–2, while the proscription of retal-
iation appears in a separate provision, §2000e–3.  Section
2000e–2, the Court asserts, "contains Title VII's ban on
status-based discrimination . . . and says nothing about
retaliation." *Ante*, at 13.  Retaliation, the Court therefore
concludes, should not be read into §2000e–2(m).  *Ante*, at
13–14.

The Court's reasoning rests on a false premise.  Section
2000e–2 does not deal exclusively with discrimination
based on protected characteristics.  The provisions stated
after §§2000e–2(a)–(d) deal with a variety of matters,
some of them unquestionably covering retaliation.  For
example, §2000e–2(n), enacted in tandem with and located
immediately after §2000e–2(m), limits opportunities to
collaterally attack employment practices installed to im-
plement a consent judgment.  Section 2000e–2(n) applies
beyond the substantive antidiscrimination provisions in
§2000e–2; indeed, it applies beyond Title VII to encom-
pass claims "under the Constitution or [other] Federal
civil rights laws."  §2000e–2(n)(1)(A).  Thus, if an employee
sues for retaliatory discharge in violation of §2000e–3(a),
and a consent judgment orders reinstatement, any person
adversely affected by that judgment (*e.g.*, an employee
who loses seniority as a result) would generally be barred

from attacking the judgment if she was given actual no-
tice of the proposed order and a reasonable opportunity to
present objections.  That Congress placed the consent-
judgment provision in §2000e–2 and not in §2000e–3 is of
no moment.  As the text of the provision plainly conveys,
§2000e–2(n) would reach consent judgments settling
complaints about retaliation, just as it would cover con-
sent judgments settling complaints about status-based
discrimination.

Section 2000e–2(g) is similarly illustrative.  Under that
provision, "it shall not be an unlawful employment prac-
tice for an employer . . . to discharge [an] individual" if she
fails to fulfill any requirement imposed in the interest of
national security.  Because §2000e–3(a) renders retal-
iation an "unlawful employment practice," §2000e–2(g)'s
exemption would no doubt apply to a Title VII retaliatory
discharge claim.  Given these provisions, Congress' place-
ment of the motivating-factor provision within §2000e–2
cannot bear the weight the Court places on it.[7]

C

The Court gives no deference to the EEOC's longstand-
ing position that §2000e–2(m) applies to retaliation be-
cause, the Court charges, the agency did not "address the
particular interplay among the status-based antidiscrimi-

---

[7] The Court's assertion that we "confronted a similar structural dis-
pute in *Lehman* v. *Nakshian*, 453 U. S. 156 (1981)," *ante*, at 17, as-
sumes its own conclusion.  As the Court explains, in *Nakshian*, the
plaintiff argued that §633a of the ADEA afforded the right to trial by
jury.  453 U. S., at 157.  An amendment to the private-sector provision,
codified at 29 U. S. C. §626(c), granted that right to plaintiffs suing
private employers, as well as state and local governmental entities.
But no one argued in *Nakshian* that the private-sector amendment
applied to the federal-sector provision.  Hence, *Nakshian*'s holding that
the ADEA does not permit a federal-sector plaintiff to try her case
before a jury is relevant only if the Court is correct that §2000e–2(m)
does not cover retaliation claims.

nation provision (§2000e–2(a)), the antiretaliation provision (§2000e–3(a)), and the motivating-factor provision (§2000e–2(m))." *Ante*, at 21. Not so.

In its compliance manual, the EEOC noted that some courts had concluded that §2000e–2(m) does not cover retaliation, citing as an example *Woodson* v. *Scott Paper Co.*, 109 F. 3d 913 (CA3 1997). In that decision, the Third Circuit acknowledged it was "given pause by the fact that . . . courts have generally borrowed from discrimination law in determining the burdens and order of proof in retaliation cases." *Id.*, at 934. One could therefore say, the Third Circuit continued, that "Congress knew of the practice of borrowing in retaliation cases, and presumed that courts would continue this practice after the 1991 Act." *Ibid.*

While *Woodson* rejected that argument, the EEOC found it sound. See EEOC Compliance Manual, at 614:0008, n. 45 ("Courts have long held that the evidentiary framework for proving employment discrimination based on race, sex, or other protected class status also applies to claims of discrimination based on retaliation."). See also EEOC Guidance, at 20, n. 14 (while §2000e–2(m) does not explicitly refer to retaliation, nothing in the provision calls for deviation from the longstanding practice of finding liability when a plaintiff demonstrates that retaliatory intent motivated an adverse employment decision). By adverting to *Woodson*, the EEOC made clear that it considered the very argument the Court relies on today. Putting down the agency's appraisal as "generic," *ante*, at 22, is thus conspicuously unfair comment.

The Court's second reason for refusing to accord deference to the EEOC fares no better. The EEOC's conclusion that "the lessened causation standard is necessary in order to prevent 'proven retaliation' from 'go[ing] unpunished,'" the Court reasons, "is circular" because it "assumes the answer to the central question at issue here,

which is what causal relationship must be shown in order to prove retaliation." *Ibid.* That reasoning will not wash. Under the motivating-factor test set out in §2000e–2(m), a plaintiff prevails if she shows that proscribed conduct "was a motivating factor" for the adverse employment action she encountered, "even though other factors also motivated the [action]." She will succeed, although the relief to which she is entitled may be restricted. See *supra*, at 9. Under the Court's view, proof that retaliation was a factor motivating an adverse employment action is insufficient to establish liability under §2000e–3(a). The Court's but-for causation standard does not mean that the plaintiff has failed to prove she was subjected to unlawful retaliation. It does mean, however, that proof of a retaliatory motive alone yields no victory for the plaintiff. Put otherwise, the Court's view "permits proven retaliation to go unpunished," just as the EEOC recognized. See EEOC Compliance Manual, at 614:0008, n. 45.

## V

### A

Having narrowed §2000e–2(m) to exclude retaliation claims, the Court turns to *Gross* v. *FBL Financial Services, Inc.*, 557 U. S. 167 (2009), to answer the question presented: Whether a plaintiff must demonstrate but-for causation to establish liability under §2000e–3(a).

The Court held in *Gross* that, in contrast to Title VII, §623(a) of the ADEA does not authorize any age discrimination claim asserting mixed motives. Explaining that uniform interpretation of the two statutes is sometimes unwarranted, the Court noted in *Gross* that the phrase "because of . . . age" in §623(a) has not been read "to bar discrimination against people of all ages, even though the Court had previously interpreted 'because of . . . race [or] sex' in Title VII to bar discrimination against people of all races and both sexes." 557 U. S., at 175, n. 2. Yet *Gross*,

which took pains to distinguish ADEA claims from Title VII claims, is invoked by the Court today as pathmarking. See *ante*, at 2 ("The holding and analysis of [*Gross*] are instructive here.").

The word "because" in Title VII's retaliation provision, §2000e–3(a), the Court tells us, should be interpreted not to accord with the interpretation of that same word in the companion status-based discrimination provision of Title VII, §2000e–2(a). Instead, statutory lines should be crossed: The meaning of "because" in Title VII's retaliation provision should be read to mean just what the Court held "because" means for ADEA-liability purposes. But see *Gross*, 557 U. S., at 174 ("When conducting statutory interpretation, we 'must be careful not to apply rules applicable under one statute to a different statute without careful and critical examination.'"(quoting *Holowecki*, 552 U. S., at 393)). In other words, the employer prevailed in *Gross* because, according to the Court, the ADEA's anti-discrimination prescription is not like Title VII's. But the employer prevails again in Nassar's case, for there is no "meaningful textual difference," *ante*, at 11, between the ADEA's use of "because" and the use of the same word in Title VII's retaliation provision. What sense can one make of this other than "heads the employer wins, tails the employee loses"?

It is a standard principle of statutory interpretation that identical phrases appearing in the same statute—here, Title VII—ordinarily bear a consistent meaning. See *Powerex Corp.* v. *Reliant Energy Services, Inc.*, 551 U. S. 224, 232 (2007). Following that principle, Title VII's retaliation provision, like its status-based discrimination provision, would permit mixed-motive claims, and the same causation standard would apply to both provisions.

B

The Court's decision to construe §2000e–3(a) to require

but-for causation in line with *Gross* is even more confounding in light of *Price Waterhouse*. Recall that *Price Waterhouse* interpreted "because of" in §2000e–2(a) to permit mixed-motive claims. See *supra*, at 8. The Court today rejects the proposition that, if §2000e–2(m) does not cover retaliation, such claims are governed by *Price Waterhouse*'s burden-shifting framework, *i.e.*, if the plaintiff shows that discrimination was *a* motivating factor in an adverse employment action, the defendant may escape liability only by showing it would have taken the same action had there been no illegitimate motive. It is wrong to revert to *Price Waterhouse*, the Court says, because the 1991 Civil Rights Act's amendments to Title VII abrogated that decision.

This conclusion defies logic. Before the 1991 amendments, several courts had applied *Price Waterhouse*'s burden-shifting framework to retaliation claims.[8] In the Court's view, Congress designed §2000e–2(m)'s motivating-factor standard not only to exclude retaliation claims, but also to override, *sub silentio*, Circuit precedent applying the *Price Waterhouse* framework to such claims. And with what did the 1991 Congress replace the *Price Waterhouse* burden-shifting framework? With a but-for causation requirement *Gross* applied to the ADEA 17 years after the 1991 amendments to Title VII. Shut from the Court's sight is a legislative record replete with statements evincing Congress' intent to strengthen antidiscrimination laws and thereby hold employers accountable for prohibited discrimination. See Civil Rights Act of 1991, §2, 105 Stat. 1071; House Report Part II, at 18. It is an odd mode of statutory interpretation that divines Congress' aim in 1991 by looking to a decision of this Court,

---

[8] See *Vislisel* v. *Turnage*, 930 F. 2d 9, 9–10 (CA8 1991); *Carter* v. *South Central Bell*, 912 F. 2d 832, 843 (CA5 1990); *Williams* v. *Mallinckrodt*, 892 F. 2d 75 (CA4 1989) (table).

*Gross*, made under a different statute in 2008, while ignoring the overarching purpose of the Congress that enacted the 1991 Civil Rights Act, see *supra*, at 8–10.

C

The Court shows little regard for trial judges who must instruct juries in Title VII cases in which plaintiffs allege both status-based discrimination and retaliation. Nor is the Court concerned about the capacity of jurors to follow instructions conforming to today's decision. Causation is a complicated concept to convey to juries in the best of circumstances. Asking jurors to determine liability based on different standards in a single case is virtually certain to sow confusion. That would be tolerable if the governing statute required double standards, but here, for the reasons already stated, it does not.

VI

A

The Court's assertion that the but-for cause requirement it adopts necessarily follows from §2000e–3(a)'s use of the word "because" fails to convince. Contrary to the Court's suggestion, see *ante*, at 5–6, the word "because" does not inevitably demand but-for causation to the exclusion of all other causation formulations. When more than one factor contributes to a plaintiff's injury, but-for causation is problematic. See, *e.g.*, 1 Restatement (Third) of Torts §27, Comment *a,* p. 385 (2005) (noting near universal agreement that the but-for standard is inappropriate when multiple sufficient causes exist) (hereinafter Restatement Third); Restatement of Torts §9, Comment *b,* p. 18 (1934) (legal cause is a cause that is a "substantial factor in bringing about the harm").

When an event is "overdetermined," *i.e.*, when two forces create an injury each alone would be sufficient to cause, modern tort law permits the plaintiff to prevail upon

showing that either sufficient condition created the harm. Restatement Third §27, at 376–377. In contrast, under the Court's approach (which it erroneously calls "textbook tort law," *ante*, at 6), a Title VII plaintiff alleging retaliation *cannot* establish liability if her firing was prompted by both legitimate and illegitimate factors. *Ante,* at 18–19.

Today's opinion rehashes arguments rightly rejected in *Price Waterhouse.* Concurring in the judgment in that case, Justice O'Connor recognized the disconnect between the standard the dissent advocated, which would have imposed on the plaintiff the burden of showing but-for causation, see 490 U. S., at 282, 286–287 (KENNEDY, J., dissenting), and the common-law doctrines on which the dissent relied. As Justice O'Connor explained:

> "[I]n the area of tort liability, from whence the dissent's 'but-for' standard of causation is derived, . . . the law has long recognized that in certain 'civil cases' leaving the burden of persuasion on the plaintiff to prove 'but-for' causation would be both unfair and destructive of the deterrent purposes embodied in the concept of duty of care. Thus, in multiple causation cases, where a breach of duty has been established, the common law of torts has long shifted the burden of proof to . . . defendants to prove that their negligent actions were not the 'but-for' cause of the plaintiff's injury." *Id.*, at 263–264 (concurring in judgment) (citing *Summers* v. *Tice*, 33 Cal. 2d 80, 84–87, 199 P. 2d 1, 3–4 (1948)).

Justice Brennan's plurality opinion was even less solicitous of the dissent's approach. Noting that, under the standard embraced by the dissent in *Price Waterhouse*, neither of two sufficient forces would constitute cause even if either one alone would have led to the injury, the plurality remarked: "We need not leave our common sense at the doorstep when we interpret a statute." 490 U. S., at 241.

B

As the plurality and concurring opinions in *Price Water-house* indicate, a strict but-for test is particularly ill suited to employment discrimination cases. Even if the test is appropriate in some tort contexts, "it is an entirely different matter to determine a 'but-for' relation when . . . consider[ing], not physical forces, but the mind-related characteristics that constitute motive." *Gross*, 557 U. S., at 190 (BREYER, J., dissenting). When assessing an employer's multiple motives, "to apply 'but-for' causation is to engage in a hypothetical inquiry about what would have happened if the employer's thoughts and other circumstances had been different." *Id.*, at 191. See also *Price Waterhouse*, 490 U. S., at 264 (opinion of O'Connor, J.) ("'[A]t . . . times the [but-for] test demands the impossible. It challenges the imagination of the trier to probe into a purely fanciful and unknowable state of affairs.'" (quoting Malone, Ruminations on Cause-In-Fact, 9 Stan. L. Rev. 60, 67 (1956))).

This point, lost on the Court, was not lost on Congress. When Title VII was enacted, Congress considered and rejected an amendment that would have placed the word "solely" before "because of [the complainant's] race, color, religion, sex, or national origin." See 110 Cong. Rec. 2728, 13837–13838 (1964). Senator Case, a prime sponsor of Title VII, commented that a "sole cause" standard would render the Act "totally nugatory." *Id.*, at 13837. Life does not shape up that way, the Senator suggested, commenting "[i]f anyone ever had an action that was motivated by a single cause, he is a different kind of animal from any I know of." *Ibid.*

\*    \*    \*

The Court holds, at odds with a solid line of decisions recognizing that retaliation is inextricably bound up with status-based discrimination, that §2000e–2(m) excludes

retaliation claims. It then reaches outside of Title VII to arrive at an interpretation of "because" that lacks sensitivity to the realities of life at work. In this endeavor, the Court is guided neither by precedent, nor by the aims of legislators who formulated and amended Title VII. Indeed, the Court appears driven by a zeal to reduce the number of retaliation claims filed against employers. See *ante*, at 18–19. Congress had no such goal in mind when it added §2000e–2(m) to Title VII. See House Report Part II, at 2. Today's misguided judgment, along with the judgment in *Vance* v. *Ball State Univ.*, *post,* p. 1, should prompt yet another Civil Rights Restoration Act.

For the reasons stated, I would affirm the judgment of the Fifth Circuit.