**<u>UNPUBLISHED</u>**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 16-1295**

TERRI L. SMYTH-RIDING,

        Plaintiff – Appellant,

    v.

SCIENCES AND ENGINEERING SERVICES, LLC; HYO SANG LEE,

        Defendants – Appellees,

    and

SCIENCES AND ENGINEERING SERVICES, INC.,

        Defendant.

Appeal from the United States District Court for the District of Maryland, at Baltimore. J. Frederick Motz, Senior District Judge. (1:11-cv-00558-JFM)

Argued: March 22, 2017                        Decided: August 17, 2017

Before AGEE, WYNN, and FLOYD, Circuit Judges.

Affirmed by unpublished opinion. Judge Agee wrote the opinion, in which Judge Wynn and Judge Floyd concurred.

**ARGUED:** Meghan Alexis Droste, LAW OFFICES OF GARY M. GILBERT & ASSOCIATES, P.C., Silver Spring, Maryland, for Appellant. Ziad Paul Haddad,

TOBIN, O'CONNOR & EWING, Washington, D.C., for Appellees. **ON BRIEF:** Gary M. Gilbert, Katherine R. Atkinson, LAW OFFICES OF GARY M. GILBERT & ASSOCIATES, P.C., Silver Spring, Maryland, for Appellant. David C. Tobin, TOBIN, O'CONNOR & EWING, Washington, D.C., for Appellees.

---

Unpublished opinions are not binding precedent in this circuit.

AGEE, Circuit Judge:

Terri L. Smyth-Riding appeals the district court's judgment in favor of her former employer, Sciences and Engineering Services, LLC ("SES"), and SES's founder, Dr. Hyo Sang Lee, on her claims of retaliation and sex discrimination. Following Smyth-Riding's presentation of evidence to a jury, SES and Dr. Lee moved for judgment as a matter of law, which the district court granted based on its conclusion that Smyth-Riding had failed to put forward evidence of causation. For the reasons set out below, we affirm.

I.

A.

SES is a scientific research and development company with facilities in Columbia, Maryland, and Huntsville, Alabama.[1] During the relevant period, Dr. Lee served as the company's president and CEO.

In June 2007, SES hired Smyth-Riding as its Director of Human Resources to work in the Columbia office. As the HR Director, Smyth-Riding's responsibilities included facilitating the hiring of new employees, coordinating employee benefits and overseeing other related HR matters. At first, she reported directly to Dr. Lee, but after a year Dr. Robert Serino, the company's Director of Operations, took over that supervisory role.

---

[1] Because the case was resolved on a motion for judgment as a matter of law, the facts are recited in the light most favorable to Smyth-Riding, the non-moving party, and we draw all reasonable inferences in her favor without weighing the evidence or assessing the witnesses' credibility. *See Anderson v. G.D.C., Inc.*, 281 F.3d 452, 457 (4th Cir. 2002).

Immediately after starting her employment at SES, Smyth-Riding began to point out corporate practices that she believed could be perceived as discriminatory. For example, at her own interview, she was asked about her age and family status, and specifically whether she had children and intended to have more children. She believed this question was improper and informed SES's senior management that they should not ask prospective employees these kinds of questions because they could be construed as discriminatory. Almost two years later, when she learned that another female applicant had also been asked if she intended to have children, Smyth-Riding assured the woman that SES did not make employment decisions on that basis and admonished the interviewers not to ask questions of that type.

Early in 2008, Smyth-Riding and Daniel Joe, SES's financial controller, began clashing over employment decisions in the finance department. For example, in the first few months of 2008, SES began accepting applications for an accounts payable position. Joe asked to see the résumés directly rather than having Smyth-Riding review them first. Later, Smyth-Riding observed that only Asian candidates were being interviewed for the position. Based on her experience with the employment pool for similar positions, Smyth-Riding believed that the pool should have been predominantly African-American, so she took her concerns to Serino, who spoke to Joe and "inserted [Smyth-Riding] back into . . . the hiring process for that position." J.A. 372. A Caucasian woman from within SES was eventually hired for this vacancy.

Smyth-Riding and Joe were again in conflict when Joe fired Zakia Harris, an African-American payroll specialist. Immediately before he did so, Joe notified Smyth-

4

Riding that he'd decided to terminate Harris' employment due to her poor performance. Smyth-Riding, however, did not accept Joe's explanation because she believed an Asian payroll employee with poor performance had not been disciplined. Although Joe further explained his rationale, Smyth-Riding did not believe the explanation was "legitimate." J.A. 364. She asked Joe to wait in order to "think about" this decision, during which time she brought her concerns to Serino, Serino's manager, and SES legal counsel. In particular, she was concerned that Harris may perceive that she was being terminated due to her race regardless of the truth. While Smyth-Riding was still talking to them, however, Joe informed Harris of his decision. Joe then told Smyth-Riding and the others that he'd already spoken with Harris.

Smyth-Riding also was unhappy with how Joe chose to hire a payroll administrator to replace Harris. Joe once again asked to see the résumés directly and when Smyth-Riding observed the list of individuals who received interviews, the names "weren't representative of the Baltimore metropolitan area" and were not "the demographic you'd expect to see" for that type of position, by which Smyth-Riding meant "a predominantly black pool of candidates."[2] J.A. 373.

Smyth-Riding was also distressed by conduct she testified occurred in the process of hiring an executive assistant for Dr. Lee in the spring and summer of 2008. One application was returned to her with the notation "too old" on it in Dr. Lee's handwriting. J.A. 393. In addition, Serino informed her that Dr. Lee wanted to hire "someone very

---

[2] As before, SES hired a Caucasian woman for the payroll administrator position.

5

young" for the position and on another occasion returned a stack of applications to her saying that all of the applicants were "too old." J.A. 381, 384. Another time, one of Dr. Lee's sons, Richard Lee, asked Smyth-Riding to bring in "chicks" to interview so that he could "hit on" them. J.A. 390. Believing she had a "big sister" relationship with Richard, Smyth-Riding chided him and said he "c[ould]n't say things like that." J.A. 390. Smyth-Riding also expressed concern with Serino and SES's Senior Vice President Randal Castro that these events constituted inappropriate actions and potentially unlawful discrimination. However, Smyth-Riding never spoke to Dr. Lee or communicated to him in any way regarding her concerns.

In the fall of 2008, SES accepted applications for a second accounts payable position, and Smyth-Riding and Joe once again found themselves at odds over who should be hired. The final two candidates consisted of an Asian woman with no relevant professional experience, but who had recently graduated with a Bachelor's Degree in the field, and a Hispanic woman with four years' experience in accounts payable, but only an Associate Degree. Smyth-Riding felt the Hispanic woman was more qualified, and voiced her objections to Joe, Serino, and Castro when Joe decided to hire the Asian college graduate.

Smyth-Riding emailed Joe about this and other areas in which the two had ongoing disagreements, centering on the role that Smyth-Riding believed she should have in Joe's decisions regarding employees within the finance division. Among other things, Smyth-Riding observed that she could provide expertise in employment-law compliance. Later, after Joe asked how SES was violating any labor laws, Smyth-Riding referenced

6

Title VII and expressed her concern that Joe had hired someone she believed to be less-qualified, but who had been referred to Joe personally, rather than the more experienced candidate. Joe responded, explaining his hiring decision and challenging what he perceived to be Smyth-Riding's belief that she had oversight of his employment decisions. He further indicated that he did not want to violate any employment laws and that, if he was doing so, Smyth-Riding should let him know and copied Serino and Castro on the email exchanges.

Around the same time, Serino completed Smyth-Riding's annual performance evaluation, marking her as "consistently exceed[ing] expectations" in four of seven categories. She received the mid-range "met expectations" mark in two categories and "met and sometimes exceeded expectations" in one category. J.A. 639–40.

In 2008, Smyth-Riding volunteered to coordinate the SES holiday party. She knew from the outset, however, that she would not be able to attend the party because she was matron of honor for a friend's wedding that same day. Smyth-Riding coordinated with other employees and had her husband attend the party to oversee things in her absence. By most accounts, the party went well, although Dr. Lee expressed displeasure that Smyth-Riding did not attend.

In late December, Smyth-Riding discovered she could no longer access SES's salary and bonus database. She protested that she needed access to the database as part of her regular HR duties, but Castro assured her that it was likely a mistake and that he would look into it.

7

In early January 2009, Smyth-Riding learned that she would only receive a pay raise of 1.7% for 2009, which upset her because the average pay raise that year was 3–4%.[3] On January 9, Smyth-Riding met with Castro to complain about her low pay raise, her continued inability to access SES's salary and bonus database, her ongoing conflict with Joe, and her discomfort with reporting to Serino given some of his views expressed in hiring Dr. Lee's assistant.

Three days later, Dr. Lee informed Castro that he had decided to terminate Smyth-Riding's employment. When Castro asked Dr. Lee why she was being terminated, Dr. Lee said it was because "she doesn't fit in" and because Huntsville was going to "becom[e] the nexus for much of the support operations." J.A. 149, 150.

Dr. Lee directed Castro to inform Smyth-Riding of his decision, which he and Serino did. Castro gave her a letter that he had signed and which explained that "[SES] no longer feels your personality fits with what is needed for this company and no longer feels it is in its best interests to continue your employment." J.A. 646.

At trial, Dr. Lee was questioned extensively about the circumstances surrounding Smyth-Riding's termination of employment. He could not initially recall whether anyone else—let alone who—first suggested that Smyth-Riding should be fired.[4] But he consistently testified that he—and he alone—made the ultimate decision to terminate

---

[3] At trial, Dr. Lee described this raise as "terrible," indicating that it was the equivalent of a pay decrease. J.A. 302–03. The record does not contain any information concerning the circumstances surrounding the setting of pay raises, but Smyth-Riding testified that Dr. Lee was in charge of setting salaries, pay raises, and bonuses.

[4] Serino and Castro both denied having recommended terminating Smyth-Riding's employment and testified they disagreed with the decision.

8

Smyth-Riding's employment. He further testified that although Smyth-Riding had initially been a good employee, "she became very bad" "probably [after] about one year of work," which would have been around June 2008. J.A. 265.

At trial, Dr. Lee pointed to several things that had informed his decision-making process. He said the "key reason" he decided to terminate Smyth-Riding's employment was that a change in SES's contract work resulted in a decreased need for and ability to pay HR employees, particularly in the Columbia office. J.A. 271. He then explained that Smyth-Riding "did not have any attribution which would justify for me to save her in [the shifting] business" structure. J.A. 273. He also testified Smyth-Riding had been "agitating" other employees about their salaries being wrong; created conflict with other employees rather than resolving conflict as an HR person should be doing; had been accused of "cheating [on her] time cards"; and had failed to attend the 2008 holiday party, but had sent her husband to do her job for her. J.A. 280–83, 287–88. In short, Dr. Lee stated his belief both that HR directors should "resolve the personal conflict, not create personal conflict" and that Smyth-Riding's "[j]ob disappeared" as a result of SES's decreased needs in Columbia and increased work in Huntsville. J.A. 288–89.

No one was hired to replace Smyth-Riding in Columbia. Instead, her responsibilities were re-routed to Huntsville's human resources manager, Matt Boyett, an individual Smyth-Riding had hired to handle the increasing on-site demands at that facility. But Boyett's title never changed and his salary was approximately half what Smyth-Riding's had been. About a year after Smyth-Riding's departure, SES hired a new Director of Human Resources, who worked out of the Huntsville office. When he

9

left, Boyett again took over those duties. No person ever replaced Smyth-Riding in the SES Columbia office.

B.

Smyth-Riding filed discrimination charges with the Maryland Human Rights Commission, which transferred the matter to the EEOC. The EEOC issued Smyth-Riding a right to sue letter.

Smyth-Riding then filed a complaint in the U.S. District Court for the District of Maryland alleging numerous claims of discrimination and retaliation. Most of those claims were dismissed prior to trial and are not at issue on appeal. Five claims proceeded to trial: retaliatory discharge and retaliatory denial of a pay raise, in violation of 42 U.S.C. § 1981, against SES and Dr. Lee; retaliatory discharge and retaliatory denial of a pay raise, in violation of Title VII (42 U.S.C. § 2000e-3, as amended), against SES; and discriminatory discharge on account of sex, in violation of Title VII (42 U.S.C. § 2000e-2), against SES.

At trial, Smyth-Riding testified, as did Dr. Lee, Castro, Serino, and other SES employees. At the close of her case, SES and Dr. Lee moved for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(a). The district court granted that motion, concluding Smyth-Riding failed to meet her burden as to the element of causation. Specifically, the court concluded there was no evidence Dr. Lee knew of Smyth-Riding's efforts to ensure compliance with federal nondiscrimination laws, or that he fired her because of that conduct.

Smyth-Riding noted a timely appeal, and the Court has jurisdiction pursuant to 28 U.S.C. § 1291.

II.

Smyth-Riding challenges the district court's decisions with respect to both her retaliation claims and her sex discrimination claim. The Court reviews de novo the district court's grant of a motion for judgment as a matter of law. *Wheatley v. Wicomico Cty.*, 390 F.3d 328, 332 (4th Cir. 2004). The motion is "properly granted if the nonmoving party failed to make a showing on an essential element of [her] case with respect to which [she] had the burden of proof." *Id.*[5] In other words, it is proper "if there can be but one reasonable conclusion as to the verdict." *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 331 (4th Cir. 2003) (en banc); *see also* Fed. R. Civ. Pro. 50(a) ("If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may" "grant a motion for judgment as a matter of law against the party."). The Supreme Court has instructed that this determination "depend[s] on a number of factors," including "the strength of the plaintiff's prima facie case" and "any other evidence that supports the employer's case and that properly may be considered." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000).

---

[5] We have omitted internal quotation marks, alterations, footnotes, and citations throughout this opinion, unless otherwise noted.

11

III.

A.

Smyth-Riding first asserts the district court erred in granting judgment as a matter of law on her retaliation claims because she presented evidence from which a jury could have found causation. To establish a prima facie claim of retaliation under either Title VII or § 1981, "a plaintiff must prove three elements: (1) that she engaged in a protected activity; (2) that her employer took an adverse employment action against her; and (3) that there was a causal link between the two events." *EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 405–06 (4th Cir. 2005). This case only concerns the third element.[6]

Retaliation claims can be proven by two avenues: one path looks to direct or circumstantial evidence of discriminatory motive while the other proceeds under the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). A plaintiff's ultimate burden as to causation is the same under either avenue of proof: she must show that the "unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 249, 251–52 (4th Cir. 2015) (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013)). In a direct evidence case, the plaintiff meets her ultimate burden as part of the prima facie case of providing "but-for" evidence

---

[6] The parties brief all three elements of a prima facie retaliation claim even though the district court only relied on a lack of proof as to causation. Because we agree with the district court's rationale, we need not address the first two elements and assume, without deciding, that Smyth-Riding would be able to meet the other two requirements. To understand the causation analysis, we note that Smyth-Riding asserts that she engaged in protected activity by "express[ing] concerns to [SES] managers about discriminatory employment practices." Opening Br. 27.

12

of causation, by showing that she would not have been subjected to the adverse employment action "but for her employer's retaliatory animus." *See id.* at 252. In a burden-shifting case, she meets her ultimate burden at the third stage of the analysis by showing pretext. *See id.* at 250, 252. In other words, "[a] plaintiff who can show that retaliation was the real reason for the adverse employment action will necessarily be able to show that the harm would not have occurred in the absence of—that is, but for—the defendant's conduct." *Id.* at 252.[7]

1.

Dr. Lee testified, and no evidence rebuts the point, that he was SES's ultimate decisionmaker. The record contains no evidence that anyone at SES except Dr. Lee had the authority to terminate Smyth-Riding's employment or set her salary.

---

[7] Prior to the Supreme Court's decision in *Nassar*, we applied the mixed-motive analysis applicable to retaliation claims arising under both Title VII and § 1981. *See Foster*, 787 F.3d at 249 (describing the mixed-motive analysis as requiring a plaintiff to show only that the "employer was motivated to take the adverse employment action by both permissible and forbidden reasons," because "[s]o long as retaliatory animus was *a* motivating factor of the adverse employment action, the employee could recover—even if the employer would have taken the same adverse employment action in the absence of such animus"). *Nassar* rejected the mixed-motive analysis for Title VII retaliation claims, and reiterated that the statutory text for Title VII retaliation claims relies on a but-for causation standard. *Id.* (describing the but-for standard as requiring a plaintiff to prove "that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer").

We have not yet decided whether *Nassar*'s analysis alters the causation standard for § 1981 claims. *See Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 281 n.5 (4th Cir. 2015) (en banc). But the parties did not brief the issue in this case and instead analyze the claims together. We need not resolve the § 1981 causation standard issue at this time because—as our analysis reflects—Smyth-Riding has failed to come forward with evidence that would suffice to show that retaliatory animus motivated the defendant's decision under either a but-for or a mixed-motive analysis.

13

Nonetheless, Smyth-Riding contends the jury could infer from the evidence that she was retaliated against due to her alleged protection activities. She first asserts that a jury could infer that Dr. Lee knew that Smyth-Riding had engaged in protected activities and gave her a low pay raise and later terminated her employment because of retaliatory animus. Specifically, she maintains that Dr. Lee's references to Smyth-Riding "agitating some of the employees" and his knowledge that Smyth-Riding and Joe disagreed about work structure provide evidence from which a jury could conclude Dr. Lee knew about Smyth-Riding's protected activities and retaliated against her because of them.

However, Smyth-Riding failed to put forth evidence at trial sufficient for a jury to conclude that she was retaliated against on the basis of her protected activities because there's no evidence that Dr. Lee was aware she was engaged in any such activities. Evidence of "the employer's knowledge that the plaintiff engaged in a protected activity is absolutely necessary to establish" the causation element of a retaliation claim because, "by definition, an employer cannot take action because of a factor of which it is unaware." *Dowe v. Total Action Against Poverty*, 145 F.3d 653, 657 (4th Cir. 1998); *accord Baqir v. Principi*, 434 F.3d 733, 748 (4th Cir. 2006) (holding that a plaintiff failed to establish causation where the evidence did not demonstrate that the decisionmaker was aware of the allegedly protected activity at the time it acted).

Here, there is no evidence that Dr. Lee knew Smyth-Riding had objected to SES's alleged discriminatory practices. At trial, Smyth-Riding was questioned on multiple occasions with respect to the employment decisions and hiring practices with which she did not agree. She repeatedly and unequivocally stated that she never presented any of

14

these concerns to Dr. Lee. The other SES witnesses confirmed that they never informed Dr. Lee of the specific practices Smyth-Riding complained about; nor were they aware of others doing so. Dr. Lee also testified that neither Smyth-Riding nor anyone at SES "ever came to [him] and [told him] that [she] was complaining about discrimination." J.A. 307. Accordingly, the record is devoid of any evidence that Dr. Lee knew about any of the actions Smyth-Riding points to as her protected conduct.[8]

Notwithstanding this absence of evidence, Smyth-Riding asserts the record could allow a jury to infer that Dr. Lee nonetheless harbored retaliatory animus because she received a low pay raise and was fired within two months of some of her complaints and because Dr. Lee offered shifting explanations for his decisionmaking, explanations that in her view "strain credulity." Opening Br. 31.[9] These arguments do not respond to what's missing here: evidence that the decisionmaker was aware of plaintiff's protected activity. Temporal proximity establishes nothing if Dr. Lee was unaware that his decisions came on the heels of any protected activities. *See, e.g.*, *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (per curiam) (observing that temporal proximity cannot provide proof of causation unless the "temporal proximity *between an employer's knowledge of*

---

[8] There is evidence that Dr. Lee knew that shortly after being hired, Smyth-Riding cautioned SES interviewers not to ask candidates about their age or familial status, but Smyth-Riding only briefly mentions that activity, and focuses on her later allegedly protected activities as the foundation for her claims.

[9] For example, Smyth-Riding relies on the temporal proximity between the decisions (both occurring in January 2009) and her fall 2008 altercations with Joe. She also notes that mere days before she was terminated, she "expressed her concerns about Serino's direction to only consider young women" to Castro. In addition, she points to SES's various explanations for its decision to terminate her employment, suggesting that they conflict and thus reflect post-hoc justifications that serve as a pretext for retaliation.

15

*protected activity* and an adverse employment action" was "very close" (emphasis added)). Similarly, even if Dr. Lee gave conflicting or shifting explanations for his decision, those explanations demonstrate pretext only if the evidence also suggests that retaliation was a but-for cause of that decision. *See, e.g.*, *Rowe v. Marley Co.*, 233 F.3d 825, 830 (4th Cir. 2000) ("Even when a plaintiff demonstrates a prima facie case and pretext, his claim should not be submitted to a jury if there is evidence that precludes a finding of discrimination, that is if no rational factfinder could conclude that the action was discriminatory."). But again, the record does not show that Dr. Lee ever had the necessary information to retaliate against Smyth-Riding: there is simply no evidence he was aware of her alleged protected activities. Without that knowledge, he could not retaliate against her for having engaged in a protected activity, fatally undermining Smyth-Riding's first theory of liability.

In addition, the testimony in the record about Dr. Lee's knowledge of Smyth-Riding's disagreement with Joe regarding access to the salary database is limited and thus does not allow the inferences Smyth-Riding urges that a jury could draw from it. Smyth-Riding contends that because Dr. Lee knew from Joe that she and Joe disagreed over access to SES's data system that tracked employee salaries and bonuses, Dr. Lee retaliated against her because this particular "battle" was part of a larger war between herself and Joe over Joe's alleged "discriminatory hiring and firing practices." Opening Br. 34. But the evidence from trial only demonstrates that Dr. Lee knew Smyth-Riding and Joe disagreed over access to salary and bonus data and that Dr. Lee believed Smyth-Riding was "agitating" "some of the employees" by telling them that their salaries were

16

wrong. J.A. 283–85; 308; 311–13. Nothing in the record connects that dispute to any alleged protected activity; there's nothing in the record regarding which employees Smyth-Riding had "agitat[ed]," (and so no information about whether they fall into a protected category), nor is there any evidence about their salaries or upon what those were based.

Smyth-Riding testified only that she had a concern that salaries and bonuses were being decided based on "favoritism" as a result of a job satisfaction survey she circulated early in her employment with SES. *See* J.A. 489. That testimony has no connection to the separate concern that salaries were being set based on prohibited discriminatory motives. And while Dr. Lee testified to his awareness that Joe and Smyth-Riding disagreed about access to the database, he also testified that Joe never discussed anything to the effect of Smyth-Riding expressing any concerns about discrimination within SES or with Joe's employment practices specifically, and that Smyth-Riding had never come to him with any such concerns either. Smyth-Riding offered no evidence to rebut Dr. Lee's testimony.

In short, nothing in this record would allow a jury to connect Dr. Lee's knowledge of the dispute over access to the salary database to knowledge of Smyth-Riding's alleged protected activities. As such, it is speculative conjecture to infer that Dr. Lee could have acted in retaliation for those activities. *See Lovelace v. Sherwin-Williams Co.*, 681 F.2d 230, 241–42 (4th Cir. 1982) (reiterating that when causation is dispositive, a case should proceed to the jury only where circumstantial evidence supports a "probability," both

17

reasonable and substantial, of an impermissible motive rather than its "mere possibility" so as to insure that the jury will not rely on speculation or conjecture).

2.

As an alternative theory of liability, Smyth-Riding contends that even if evidence of Dr. Lee's knowledge was lacking, the record would allow a finding of causation based on a cat's paw theory of liability. Specifically, she asserts a "jury could reasonably conclude that Joe or Richard Lee's retaliatory animus was the proximate cause of [Dr.] Lee's decision to fire [her] and effectively decrease her salary." Opening Br. 37. In particular, she faults the district court for characterizing the conflicts between Joe and herself as a management conflict rather than hostility stemming from Smyth-Riding's attempts to prevent Joe from violating employment laws. Her argument as to Richard Lee is less developed, as she only notes that the district court allowed an inference that Richard told Dr. Lee that Smyth-Riding stood in his way between "hiring attractive, young women whom he could hit on," but then did not allow that inference to have the weight she attaches to it. Opening Br. 38.

In *Staub v. Proctor Hospital*, 562 U.S. 411 (2011), the Supreme Court "consider[ed] the circumstances under which an employer may be held liable for employment discrimination based on the discriminatory animus of an employee who influenced, but did not make, the ultimate employment decision." *Id.* at 413. *Staub* arose in the context of antimilitary animus and the Uniformed Services Employment and Reemployment Rights Act ("USERRA"), but its holding is nonetheless applicable because it relied on traditional agency principles to hold that the so-called cat's paw

18

theory of liability is a possible means of holding employers liable for discriminatory conduct.[10]  Under the cat's paw theory, as articulated in *Staub*, "if a supervisor performs an act motivated by [unlawful] animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable."  *Id.* at 422; *see also id.* at 420 ("[T]he requirement that the biased supervisor's action be a causal factor of the ultimate employment action incorporates the traditional tort-law concept of proximate cause.").[11]

The extent to which co-workers, as opposed to *supervisors*, can be the basis for invoking the cat's paw theory of liability has not been resolved by the Supreme Court. Indeed, in *Staub*, the Supreme Court expressly declined to decide whether and to what extent an employer could be liable for retaliation in the event that a co-worker's animus influenced the ultimate employment action.  *Id.* at 422 & n.4 ("We express no view as to whether the employer would be liable if a co-worker, rather than a supervisor, committed a discriminatory act that influenced the ultimate employment decision.").  And this Court has, in a decision issued prior to *Staub*, declined to impose cat's paw liability on the basis

---

[10] In addition, this Court has previously acknowledged the theory's applicability in Title VII cases.  *See, e.g.*, *Hill*, 354 F.3d at 290–91.

[11] Because the USERRA uses a mixed-motive causation standard, while Title VII retaliation claims use a but-for causation standard, the Supreme Court's articulation of when an employer can be held liable ordinarily would require some refinement in a Title VII retaliation case, like this one.  *See supra* n.6.  That is to say, while *Staub* permitted a plaintiff to prevail under a cat's paw theory of liability where the supervisor's action was only "*a* causal factor" in the analysis, 562 U.S. at 420–21 (emphasis added), a Title VII retaliation plaintiff would have to show that but for the supervisor's conduct, the adverse employment action would not have occurred.  *See Foster*, 787 F.3d at 252.  The nuance of this distinction is of no moment in this case, however, because Smyth-Riding cannot prove that Richard Lee or Joe's alleged retaliatory animus led them to do anything that was a factor in Dr. Lee's decisionmaking.

19

of a nonsupervisory, biased employee's influence on the ultimate employment decision. *Hill*, 354 F.3d at 290–91 ("[W]e decline to endorse a construction [of cat's paw liability] that would allow a biased subordinate who has no supervisory or disciplinary authority and who does not make the final or formal employment decision to become a decisionmaker simply because he had a substantial influence on the ultimate decision or because he has played a role, even a significant one, in the adverse employment decision.").

In this case, there is no evidence in the record that either Joe or Richard Lee had supervisory authority over Smyth-Riding, only that they were co-workers whose responsibilities overlapped at times given the nature of an HR director's work.[12] To extend cat's paw liability to these circumstances would constitute an expansion of the theory to a context in which its application has not been recognized. *See Staub*, 562 U.S. at 421–22 ("Since a supervisor is an agent of the employer, when he causes an adverse employment action the employer causes it; and when discrimination is a motivating factor in his doing so, it is a motivating factor in the employer's action . . . . We therefore hold that if a supervisor performs an act motivated by antimilitary animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate

---

[12] At one point Richard Lee emailed Smyth-Riding asking that she report her leave and touch base with him periodically regarding HR's ongoing projects and goals, and there is evidence in the record that his role in SES was less defined given that he is Dr. Lee's son. But Smyth-Riding testified that her initial supervisor was Dr. Lee, and he later transferred that responsibility to Serino. Smyth-Riding did not testify that Richard Lee was her supervisor or had any authority over her employment status. On this record, there's insufficient evidence from which a jury could conclude that Richard Lee exercised the sort of supervisory or disciplinary authority over Smyth-Riding that *Staub* and our case law require.

20

cause of the ultimate employment action, then the employer is liable under USERRA."); *Hill*, 354 F.3d at 290 ("When a formal decisionmaker acts merely as a cat's paw for or rubber-stamps a decision, report, or recommendation actually made by a subordinate, it is not inconsistent to say that the subordinate is the actual decisionmaker or the one principally responsible for the contested employment decision, so long as he otherwise falls within the parameters of the discrimination statute's definition of an employer or agent of the employer.").

There is no evidence that either Richard Lee or Joe "perform[ed] an act motivated by [retaliatory] animus that [either individual] *intended* . . . to cause an adverse employment action" by Dr. Lee. *See Staub*, 462 U.S. at 422. Put another way, there's no evidence from which a jury could find that Richard Lee's or Joe's actions were "a causal factor," let alone that the adverse employment actions would not have occurred "but-for" something either of them did. The testimony at trial does not indicate that either Richard Lee or Joe spoke to Dr. Lee about Smyth-Riding's activities, performance, or employment apart from Joe mentioning their conflict about access to the salary database. Moreover, there's nothing from which a jury could conclude that either Richard Lee or Joe intended for Dr. Lee to take action against Smyth-Riding, or that Dr. Lee in fact took action as a proximate cause of his son's or Joe's conduct. Nor, for that matter, is there any evidence that either Richard Lee or Joe ever expressed a desire to retaliate against Smyth-Riding because of her protected activities. Richard Lee was unavailable to testify at trial and the portions of his deposition that were read into evidence did not cover any conversations with his father about Smyth-Riding in any capacity. Joe did not testify.

21

What remains, then, is Dr. Lee's testimony that he did not recall speaking to Joe about Smyth-Riding other than about the issue regarding the salary database. J.A. 286, 292–93, 307. Dr. Lee was not questioned about any communications with Richard Lee about Smyth-Riding. Thus, Smyth-Riding did not come forward with evidence that would allow the jury to connect Dr. Lee's decisions to any alleged retaliatory-based act of Richard Lee or Joe.

For these reasons, the record does not contain evidence that would allow a jury to hold SES liable under a cat's paw theory of liability.

B.

Smyth-Riding next contends the district court erred in granting judgment as a matter of law on her sex discrimination claim. She notes the district court's sparse explanation for its decision, asserts she made out a prima facie case of discriminatory discharge, and urges that the same actor inference does not apply to her situation.

Title VII makes it unlawful for an employer to discriminate against an employee on the basis of sex. 42 U.S.C. § 2000e-2(a)(1). As with a retaliation claim, a sex discrimination claim can be proved through direct or circumstantial evidence, or through *McDonnell-Douglas'* burden-shifting framework.

While the district court did not elaborate on the reasons for granting SES and Dr. Lee's motion with respect to this claim, the record nonetheless shows that it engaged in extensive questioning of counsel about that claim while the motion was being argued. Moreover, causation—which the district court discussed at length—is part of both a retaliation and a sex discrimination claim. Specifically, no matter what method of proof

22

Smyth-Riding relied on, she bore the ultimate burden of proving that she "was the victim of intentional discrimination." *Reeves*, 530 U.S. at 153. This burden required her to "produce sufficient evidence upon which one could find that the protected trait actually motivated [SES's] decision." *Hill*, 354 F.3d at 286. Put another way, "[t]he protected trait must have actually played a role in [SES's] decisionmaking process and had a determinative influence on the outcome." *Id.* Thus, many of the district court's statements with respect to causation apply equally to the sex discrimination claim. *See, e.g.*, *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216–17 (4th Cir. 2016) (discussing the different causation standards in discrimination and retaliation claims).

As for her failure of proof, the record contains no affirmative evidence that SES terminated Smyth-Riding's employment because she was a woman. And while Smyth-Riding contends that a jury could nonetheless conclude that SES was motivated by discriminatory animus because her duties were transferred to Boyett, a male subordinate in the Huntsville office, the record she developed at trial did not show that this individual was given the title, salary, or full panoply of job responsibilities that Smyth-Riding possessed. In addition, SES did not hire anyone to replace Smyth-Riding as the HR director operating out of Columbia.

Additionally, that Dr. Lee both hired and fired Smyth-Riding gives rise to a strong inference that the termination of her employment was *not* discriminatory. When the same individual hires the plaintiff and then is accused later of taking an adverse employment action, "a powerful inference [arises] that the [action] was not motivated by discriminatory animus." *Evans v. Techs. Applications & Serving Co.*, 80 F.3d 954, 959

23

(4th Cir. 1996); *see also Proud v. Stone*, 945 F.2d 796, 798 (4th Cir. 1991) ("When the hirer and firer are the same individual, there is a powerful inference relating to the 'ultimate question' that discrimination did not motivate the employer, and the early resolution of this question need not be derailed by strict fealty to proof schemes."). This is so because "employers who knowingly hire workers within a protected group seldom will be credible targets for charges of pretextual firing." *Proud*, 945 F.2d at 798.

Smyth-Riding asserts that this inference should not apply in her case given the length of time that lapsed between the decisions. But Dr. Lee hired Smyth-Riding in June 2007 and terminated her employment in January 2009, some 20 months later. Similarly, in *Evans*, the employer hired the plaintiff in June 1991 and the challenged employment decision was made in February 1993, some 21 months later. *See Evans*, 80 F.3d at 959. Smyth-Riding's suggestion thus lacks a foundation, and we afford SES the strong inference of non-discriminatory conduct given Dr. Lee made both decisions.

In short, the lack of evidence to support Smyth-Riding's position coupled with the legal inference of non-discrimination provide ample basis for affirming the district court's grant of judgment as a matter of law to SES on Smyth-Riding's sex discrimination claim.


IV.

For the aforementioned reasons, the judgment of the district court is

*AFFIRMED*.

24